UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| RONALD EATON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08-CV-370-B-W |
| | ) | |
| HANCOCK COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## RECOMMENDED DECISION

Plaintiff Ronald Eaton has filed an eight-count complaint against Hancock County and numerous other defendants based on an arrest effectuated by Deputy Jason Lepper and subsequent events that transpired at the Hancock County Jail. Now pending is a motion for summary judgment filed by Hancock County, its Sheriff's Department, and Department personnel (the "County Defendants"). The Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636. Based on my review of the motion, I recommend that the Court grant the motion, in part.

### FACTS

The following factual recitation is drawn from the parties' statements of material fact submitted and construed in accordance with District of Maine Local Rule 56. The underlying statements are found in the County Defendants' Statement of Material Facts ("CDSMF," Doc. No. 83), the Plaintiff's Opposing Statement ("POS," Doc. No. 109), the Plaintiff's Additional Statement ("PAS," also Doc. No. 109), and the County Defendants' Reply Statement ("CDRS," Doc. No. 128). Because Ronald Eaton is the party opposing the summary judgment motion,

where disputes exist as to the proper characterization of "the facts," the following recitation states the facts in the manner that favors Eaton, provided he has cited evidentiary support for his version of events.

*Defendants' Statement and Plaintiff's Opposing Statement*

On November 5, 2006, Plaintiff Ronald Eaton went to the China Hill Restaurant in Ellsworth with his girlfriend, Cindy Furrow, at approximately 5:00 p.m. Eaton parked his car in front of the restaurant. Eaton and Furrow were seated in the lounge area of the restaurant and ordered a meal and a volcano bowl to share. Prior to arriving at the restaurant, Eaton had consumed two beers at home prior to 3:00 p.m. A volcano bowl is a mixed drink that is approximately equal to three alcoholic drinks. Ms. Furrow did not like the volcano bowl, so after she tried it she did not drink any more of it. Eaton continued drinking. (CDSMF ¶¶ 51-55, 57-59 (all admitted by Eaton).)

During their visit to the restaurant, Eaton and Furrow got into an argument. Ms. Furrow called Eaton a jerk, an idiot and worse in a voice that was loud enough so others could hear it in the restaurant. The fight continued for approximately 20 to 30 minutes. Eventually, Ms. Furrow told Eaton that she was going to the bathroom, but she left the restaurant and went to another establishment. After Ms. Furrow's departure, Eaton became loud. He also panicked when she did not return. Eaton looked for her and hollered inside the women's bathroom. Eaton was also approaching people in the restaurant, patting them on the shoulder, and asking if they had seen his girlfriend. (Id. ¶¶ 60-67 (all admitted by Eaton with the exception of statement 61[1]).)

---

[1] In statement 61 the County Defendants describe the insults Ms. Furrow directed at Eaton at the restaurant. They mistakenly cite page 11 of Mr. Eaton's deposition transcript. Assuming they meant to cite Ms. Furrow's deposition transcript, I checked page 11 of that transcript and found the testimony that supports the statement.

While Mr. Eaton was present at the China Hill Restaurant, Hancock County Sheriff's Deputy Jason Lepper was also present at the restaurant, attending a family gathering. Deputy Lepper was off duty and out of uniform. (Id. ¶¶ 5, 68.)

While seeking Ms. Furrow, Eaton was moving about from the front of the restaurant to the bar and outside. Eaton went in and out of the restaurant a few times. Deputy Lepper observed Eaton outside. He observed Eaton run into the doors at the entrance of the restaurant, stumble back, pull the doors open, and walk inside. Lepper observed that Eaton was unsteady on his feet. Lepper also smelled alcohol on Eaton as he walked by. A few minutes later, Deputy Lepper saw Eaton enter the lobby and heard him swear loudly that "this is fucking bullshit." (Id. ¶¶ 73-79 (admitted).)

Deputy Lepper and several other witnesses believed from appearances that Eaton was intoxicated. At some point, Deputy Lepper saw Eaton go outside and reach into his pocket. Deputy Lepper and other witnesses were concerned that Eaton would try to drive.[2] Deputy Lepper told his wife and Joshua Stevens, his brother-in-law, to call the Sheriff's Department or the Ellsworth Police Department to let them know that there was someone he thought was drunk and may try to drive. (Id. ¶¶ 80-87 (admitted).)

Meanwhile, Deputy Lepper followed Eaton into the parking lot, remaining 15-20 feet behind him. Eaton does not remember seeing anyone following him, but he was not concerned with that because he was worried about Ms. Furrow. Lepper watched Eaton stumble around, mumbling and talking to himself. Lepper overheard Eaton say something about his car and his woman. Lepper and Eaton were in the vicinity of an exit from the bar area and Eaton tugged on

---

[2]     Among the other witnesses was Kathleen Jellison, the bartender, and another individual named Frank Stanley, a retired police officer.

the door to open it, but it would not open.  Lepper yelled at Eaton to stop and identified himself as a police officer.  Lepper ordered Eaton to stop again and ordered him to get on the ground. Eaton did not comply but rather turned toward Lepper in a fighting stance and moved toward him.  (Id. ¶¶ 88-91, 96, 98-101 (admitted).)  Eaton was yelling, swearing, and being belligerent. (Id. ¶ 103 (admitted).)

Although he admits moving toward Lepper, "being belligerent," and assuming "a fighting stance," Eaton denies statements asserting that he grabbed or swung at Deputy Lepper or Mr. Stevens.  (Id. ¶¶ 92-94;  POS ¶¶ 92-94.)  Eaton also denies a statement to the effect that Jason Lepper thought Eaton was going to punch him.  (CDSMF ¶ 102;  POS ¶ 102.)  In support of the denials, Eaton cites his own deposition testimony to the effect that Lepper and others beat him up, that he did not see it coming, and that it happened out of the blue.  (Eaton Dep. at 14:13-18, 16:3-9, 40:7-11, 46:13-15, 50:21-51:1.)  According to Lepper, he was trying to reenter the restaurant when he was grabbed and "jumped."[3]  (Eaton Dep. at 38.)

Lepper tried to get control of Eaton by pushing him against the building.  Lepper was able to put Eaton in a wristlock and to put Eaton's right arm behind Eaton's back.  Eaton was struggling and holding onto the door.  (CDSMF ¶¶ 103-106 (admitted).)  Lepper told Eaton to stop resisting and words were stated in regard to breaking Eaton's arm.  (Id. ¶ 107;  POS ¶ 107.) Two witnesses said it looked like a struggle between Eaton and Lepper.  (CDSMF ¶ 108.) Deputy Lepper's father, James Lepper, got involved and pried Eaton's fingers off the door.  (Id. ¶ 109.)  The elder Lepper and Ms. Jellison, the restaurant bartender, maintain that Eaton was

---

[3]    There is a question as to how this testimony should be interpreted in light of Eaton's admissions that he was spoken to first, turned in a fighting stance, moved toward Lepper, and was being belligerent prior to being grabbed. Based on these admissions, I reject any suggestion that Eaton was jumped or grabbed from behind without any prior communication or before having a chance to turn around and act in a belligerent fashion.  In his Statement of Additional Facts, Eaton describes a scenario in which he was aware that Lepper was following him and was trying to get away, as described below.

forced to the ground face-down and held until a police cruiser arrived.  (Id. ¶¶ 56, 110.)  Eaton

makes a blanket denial regarding this statement, but his denial appears to be directed to the

position in which his hands were being held, not to whether or not he was taken to the ground.

Eaton offers testimony from Mr. Stanley to the effect that the arm Deputy Lepper had hold of

was twisted behind Eaton's back with his hand unnaturally close to the base of his neck.  (POS ¶

110;  Stanley Dep. at 33.)

Robert Morang, another Hancock County Sheriff's Deputy, arrived on the scene in a

police cruiser while Eaton was on the ground.  Morang placed his handcuffs on Eaton and Eaton

was placed in a cruiser and transported to the Hancock County Jail by Ellsworth Police Officer

Shawn Willey.  At the jail, Willey charged Eaton with disorderly conduct and criminal

threatening and refrained from having Eaton sign the summons because Eaton was "agitated."

(CDSMF ¶¶ 12, 112-114, 116-118.)  At the jail, Corrections Officers Joshua Gunn and Ryan

Haines met Eaton in the jail sallyport.  They were unaware of what happened during Eaton's

arrest.  They were simply told to expect someone who was argumentative, belligerent, and

combative.  (Id. ¶¶ 119, 122-124.)  Gunn and Haines "assisted" Eaton in getting out of the cruiser

and "escorted" him into the jail.  (Id. ¶¶ 127-129;  POS ¶¶ 127-129.)  Eaton appeared intoxicated.

He was unstable on his feet, slurred his speech, and smelled like alcohol.  (CDSMF ¶¶ 130-131.)

Officer Willey completed a "safekeeping" record in the jail and recommended that Eaton be held

until sober.  (Id. ¶¶ 132-133.)

At his deposition, Eaton acknowledged that he was uncooperative, loud, and swearing

while at the jail.  (Eaton Dep. at 157-158.)  The County Defendants offer this testimony in

support of their motion and Eaton requests that the testimony be stricken, asserting by way of

plaintiff's counsel that Eaton had taken Oxycodone during his deposition and became rambling

and long-winded.  (CDSMF ¶¶ 134-137;  POS ¶¶ 134-137.)  I conclude that counsel's representation or characterization of Eaton's mental state is not a sufficient basis to ignore his client's testimony.

Inside the jail, corrections officers started the booking process.  The fingerprinting process was performed in a rough manner because Eaton was not very cooperative.  (CDSMF ¶¶ 139-140.)  Eaton was asked questions to determine if he was a suicide risk and responded to the effect that he was not.  (Id. ¶¶ 143-144;  Eaton Dep. at 105.)  According to Officer Haines and Heather Sullivan, the booking officer on duty, Eaton did not respond to the suicide questions.  The County Defendants offer this assertion in support of the decision to place Eaton in a suicide smock for the duration of his stay.  (CDSMF ¶¶ 144-145.)

Because of Eaton's conduct and the belief that he was very intoxicated it was decided to subject him to an 8-hour hold.  (Id. ¶ 148.)  Haines and Gunn took Eaton into the nurse's station to be changed into a suicide smock.  (Id. ¶ 149.)  According to Gunn's testimony, Eaton refused to cooperate with changing out of his street clothes and flailed his arms and became aggressive when Officer Gunn approached him for that purpose.  (Id. ¶¶ 152, 156-159.)  Eaton acknowledged during his deposition that he was not cooperative, did not volunteer to change himself, and was probably yelling, but denies offering any physical resistance or any threatening movements.  (Eaton Dep. at 70-71, 159.)[4]  Gunn or Haines administered two bursts of OC spray to motivate Eaton's compliance or to make it difficult for him to offer physical resistance, "took him to the ground," handcuffed him, partially disrobed him, placed him in a segregated cell (cell HD1), removed the handcuffs, and changed him over into the smock.  According to Gunn, Eaton

---

[4]     There is a similar request to strike on the basis of the Oxycodone medication.

was warned that he would be "maced," if necessary, in order to change him into the smock. (CDSMF ¶¶ 160-165, 168, 170-171; Gunn Dep. at 60-64.) Also according to Gunn, the purpose of forcing Eaton to change out of his street clothes was that he was being treated as a potential suicide risk. (Gunn Dep. at 61:20-62:1.) Eaton's detention has been classified as "intox segregation" with 15-minute observations. (CDSMF ¶ 171.)

The next thing Eaton remembers is waking up in cell HD1. He cannot recall how long he slept. At some point Eaton was moved to another cell, HD2, and he was handcuffed for this move. Following another unspecified spell, Eaton began to feel pain flickering in his arms and he started banging on the door and yelling to get the attention of a corrections officer. Eaton was mad and he also kicked the door. (Id. ¶¶ 173-178.)

At some point, soft restraints were placed on Eaton. According to the officers, Eaton was able to move his arms about and did not appear to be impaired. Eaton asked for some aspirin, but was refused. He also asked to see a doctor. Eaton explained that his shoulder hurt. He was advised to stop using his arm and that a physician's assistant would be called. (Id. ¶¶ 180-186; Pl.'s Opposing Statement ¶ 185.) Officer Haines contacted a physician's assistant who advised that Eaton continue to be observed. The PA may or may not have advised that Eaton receive ice. It appears to be uncontested that ice was supplied, but, according to Eaton, it was a mock gesture consisting of three ice cubes in a plastic bag. (CDSMF ¶ 189; Eaton Dep. at 141.)

According to Eaton's deposition testimony, four men entered his cell after this, placed him in handcuffs, applied OC spray, and kicked him at least two times. He cannot remember who the men were, but says that one was wearing a camouflage suit. Thereafter the men removed the handcuffs and left him in the cell. After roughly one more hour of waiting, Eaton was permitted to bail himself out at approximately 4:00 a.m. (CDSMF ¶¶ 191-196, 200.)

7

Crystal Hobbs, a part-time corrections officer, is among the named defendants.  Eaton admits that Hobbs was not involved in the changing incident, did not ever use physical force against him, did not observe anyone else kicking or hitting him, and did not observe any blood, bruises, or visible injuries on Eaton.  (Id. ¶¶ 203-206.)

Another named defendant, part-time Corrections Officer John Weaver, was also on duty that night.  He was in Eaton's vicinity that evening, observed Eaton directly, and placed restraints on Eaton while Eaton was in cell HD2.  (Id. ¶¶ 207-209, 211;  POS ¶ 208.)  Eaton admits that Weaver did not spray Eaton and that Weaver did not see anyone else spray Eaton or kick or hit Eaton in the nurse's station.  (CDSMF ¶¶ 210, 212.)

Defendant Heather Sullivan participated in booking Eaton, but did not participate in handcuffing him, removing his clothes, spraying him, or applying any physical force to his person at any stage.  (Id. ¶¶ 213-216.)  Eaton denies a statement to the effect that Sullivan had nothing to do with events of the evening, observing that Sullivan was the sergeant on duty and had supervisory authority over the others, but Eaton also admits that she did not see anyone kicking or hitting him.  (Id. ¶¶ 42, 217;  POS ¶ 214.)

Defendant Robert Morang was present at the jail's booking room for some time early that evening.  Eaton admits, however, that Deputy Morang did not spray, kick, or hit Eaton and did not observe anyone else do so, either.  (CDSMF ¶¶ 219-222.)

At their depositions, both Deputy Lepper and Officer Haines testified that Deputy Lepper was not present at the jail on the night of November 5, 2006, or during the early morning hours of November 6.  (Id. ¶ 223.)  At his deposition, Mr. Eaton testified that he is 90 percent sure that

Lepper was the man in camouflage who entered his cell when the alleged beating in cell HD2 was administered.  (POS ¶ 223;  Eaton Dep. at 234-235.[5])

Carl Dannenberg has been the Jail Administrator at the Hancock County Jail since August 2005.  As such, Dannenberg is responsible for jail operations.  There is no evidence in the record that Dannenberg was at the scene of the incidents that are the subject of this suit or that he had any direct involvement or communications with the deputies or corrections officers while these incidents were transpiring.[6]  (CDSMF ¶¶ 43, 44, 46.)

William Clark has been the Sheriff of Hancock County for over 28 years.  As Sheriff, Clark is the final decision maker at the Hancock County Sheriff's Department and he has to approve all policies and procedures at the Hancock County Sheriff's Department.  As with Administrator Dannenberg, there is no evidence in the record that Sheriff Clark was at the scene of the incidents or that he had any direct involvement or communications with the deputies or corrections officers while these incidents were transpiring.  (Id. ¶¶ 47-50.)

*Plaintiff's Additional Statement and Defendants' Reply Statement*

The following recitation is limited to additional statements not already included above. As a preliminary matter, the County Defendants have requested that the Court strike all 50 of Eaton's additional statements because the statements are "cut and pasted" from a statement Eaton

---

[5]      Eaton did not cite page 235 of his deposition testimony, but I reviewed it after reading page 234.

[6]      Mr. Eaton requests that statements related to the lack of any "involvement" by the Jail Administrator or the Sheriff be stricken because Sheriff Clark testified that he did not personally investigate these events after they occurred.  (Pl.'s Opposing Statement ¶¶ 46, 48, 50.)  I am not persuaded that this testimony justifies striking the statements.  However, I think recasting the County Defendants' statements concerning the lack of any "involvement" by the Jail Administrator or the Sheriff would be appropriate because the word involvement is exceedingly broad.  I would prefer to characterize the record, instead, as devoid of any evidence of direct participation in the events that give rise to Mr. Eaton's claims.  As far as supervisory liability is concerned, I have looked to Eaton's statements to see if there is any evidence of supervisory "involvement" because it is Eaton's burden to demonstrate a genuine issue on supervisory liability.  Those statements are addressed in the discussion portion of this Recommended Decision under the municipal liability heading.

filed in support of his own, separately filed motion for summary judgment. This is not a valid ground for striking the additional statements. The fact that Eaton filed a statement in support of his own motion does not permit him to neglect filing an additional statement in opposition to the County Defendants' motion. Nothing prevents a party from asserting the same facts in opposition to a summary judgment motion as he asserts in support of his own bid for summary judgment. The request to strike the entire additional statement does not deserve even this much comment. It is overruled.

If there is any transgression in respect to the parties' statements of material fact concerning the instant motion, it actually exists in the County Defendants' reply statement. Rather than stating their admissions, qualifications, and denials in their reply statement, the Defendants have simply cross-referenced the assertions found in their response to the Plaintiff's statement in support of his own motion. Cross-references in the context of summary judgment statements of fact are exceedingly aggravating from the perspective of trying to efficiently review a summary judgment record. Maybe defense counsel was loath to follow Plaintiff's example of cutting and pasting after criticizing the Plaintiff's use of this simple word-processing technique, but I cannot see how it would have appreciably increased their burden of responding and it would have been much more useful to the Court had they simply cut and pasted the responses found in the other filing instead of offering the Court a series of cross-references that jump around within another document.[7]

---

[7]     I can understand defense counsel's frustration over the 1043-paragraph statement that plaintiff's counsel filed in support of an effort to win summary judgment in Plaintiff's favor on his claims. Thankfully, the additional statement omits 993 of those statements. There does not appear to be a very collegial relationship between Mr. Eaton's attorneys and those retained by the County Defendants, which is the most unfortunate aspect of this harangue over statements of material facts and requests to strike and so forth. Given the nature of their respective practices, they should seriously consider détente, if not rapprochement. The parties are entitled to vigorous representation, but attorneys are not partisans.

The salient additions from Plaintiff's Additional Statement are as follows.

Prior to being accosted at the restaurant, Mr. Eaton went to the side door of the building in an effort to avoid Deputy Lepper (who was not in uniform, did not display any identification, and did not state that Eaton was under arrest). Deputy Lepper grabbed Eaton's right wrist while Eaton was grabbing the door with his left hand. (PAS ¶¶ 5-7, 15, 17.) During this encounter, Eaton was carrying bags with leftovers. (PAS ¶ 48.) After laying hands on Eaton, Deputy Lepper stated words to the effect that Eaton would have a broken arm if he did not comply with the effort to control him. (Doc. No. 115 ¶ 13.) Deputy Lepper testified during a state court hearing on a motion to suppress, as follows:

> I was yelling at him to – to stop, just get on the ground, stop resisting. Told him that it – *I would break his arm if he didn't*; that it was – I was trying to convey that this was serious and that I'm going [to] do what I have to do to try to control you; that if you don't stop, this much pressure could break his arm.

(PAS ¶ 8, citing Doc. No. 86 at 19 (emphasis added).)

Frank Stanley, a former police officer who witnessed the events at the restaurant and agreed with the characterization that Eaton was intoxicated, stated that he had no idea why the men were trying to apprehend Eaton. (Id. ¶ 9.) According to Stanley, Deputy Lepper had Ronald Eaton's hand and arm on the middle of his back, halfway up, and then said something about breaking an arm "when it was enforced a little bit further up his back . . . damn near to the back of his neck" and to a degree "[t]hat's just not normal." (Id. ¶¶ 12-13; Stanley Dep. at 33.) After Deputy Morang arrived and handcuffed Eaton, Eaton questioned why he was being arrested and Deputy Lepper stated: "Because you're being a drunk asshole." (PAS ¶ 19.) Deputy Lepper advised Officer Willey to charge Eaton with disorderly conduct and criminal threatening. (Id. ¶ 21.)

The Maine Superior Court granted Ronald Eaton's Motion for Judgment of Acquittal at the end of the State's case and excused the jury.  (Id. ¶ 22.)  According to Deputy Lepper, he never received any disciplinary action, counseling, or training in the wake of the Eaton matter.  (Id. ¶¶ 23-24.)  Testimony by Jail Administrator Dannenberg and Sheriff Clark was to the same effect.  (Id. ¶¶ 33-34.)  Sheriff Clark has given statements to the effect that he stands behind Deputy Lepper's decision to arrest Eaton.  (Id. ¶¶ 28, 30.)  Eaton has retained an expert witness with 25 years of experience in the Maine State Police who opines that Deputy Lepper should not have apprehended Eaton at the restaurant.  (Id. ¶ 29.)

Eaton has testified that he thinks it was Officer Haines who administered the OC spray in the nurse's station.  The County Defendants say it was Gunn.  Eaton says he was kicked at this time.  The County Defendants deny that Eaton was kicked.  (Id. ¶¶ 36-37;  CDRS ¶¶ 36-37, citing Doc. No. 115 ¶¶ 382-383.)

Eaton says that there were three guards in cell HD2 and also a fourth man in fatigues whom Eaton believes was Deputy Lepper.  The County Defendants deny that Lepper was present and that there was anyone wearing fatigues but they admit that there were three guards in the cell.  Eaton says the pain in his shoulder was excruciating and that he was banging on the cell and asking for a doctor.  Eaton says his request was laughed at and that he was sprayed with more OC spray, kicked, and told he deserved it.  Defendants deny this beating ever took place.  (PAS ¶¶ 38-39, 42-43;  CDRS ¶¶ 38-39, 42-43, citing Doc. No. 115 ¶¶ 385, 387, 406-407.)  The record reflects that Gunn, Haines, and Weaver were the three corrections officers who entered Eaton's cell during his visit.  (CDSMF ¶¶ 175 & 179, citing Gunn Dep. at 48 and Haines Dep. at 41;  PAS ¶ 39, citing Eaton Dep. at 96-97.)

12

After being released from the jail, Eaton's brother picked him up and took him to Maine Coast Memorial Hospital in Ellsworth. The physician who later operated on Eaton has testified that "there was a circumferential, almost a degloving of the entirety of the rotator cuff around the humeral head which is much bigger than your typical rotator cuff injury, and that [they] elected to open the shoulder so [they] could get a better global view of the shoulder." The physician has also indicated that the injury was not self-inflicted, based on a reasonable medical probability and surgical findings. (PAS ¶¶ 46-47, 49.)

### DISCUSSION

Ronald Eaton's complaint recites the following eight counts:

Count I: A claim for an alleged Fourth Amendment violation that specifically identifies "excessive force and the treatment of arrestees," and includes supervisory and municipal liability verbiage (*i.e.*, "deliberate indifference and reckless disregard," as well as reference to an alleged county policy or custom). (Compl. ¶¶ 36-38.)

Count II: Claims of assault, false arrest, and false imprisonment based on the alleged absence of any valid basis for applying force to Eaton's person or subjecting him to arrest and detention under the circumstances.

Count III: A claim for negligent infliction of emotional distress.

Count IV: A civil rights conspiracy, including a citation to 42 U.S.C. § 1985(3) and a reference to equal protection as well as "the rights secured . . . by the United States Constitution and the Constitution and the Laws of the State of Maine." (Compl. ¶ 48.)

Count V: Another civil rights conspiracy, this time citing 42 U.S.C. § 1983 and referencing the same rights.

Count VI: A plea for punitive damages.

Count VII: An invocation of due process under the Fourteenth Amendment, including a reference to a liberty interest in bodily integrity and complaining of deliberate indifference to serious medical needs.

Count VIII: A claim of negligence premised on physically assaultive behavior.

13

With the pending motion (Doc. No. 82), the County Defendants seek the entry of judgment in their favor, as a matter or law, against all of the claims in these eight counts.  As for the claims arising from federal law, the County Defendants brief excessive force and false arrest theories under the Fourth Amendment and denial of medical care under the Fourteenth Amendment, all within the context of asserting the qualified immunity defense.  (Mot. at 3-16 & 16-19, respectively.)  They also dispute the existence of any municipal or supervisory liability or any conspiracy on this record.  (Id. at 19-25.)  Finally, they contend that they have immunity against the state law tort claims pursuant to the Maine Tort Claims Act.  (Id. at 25-30.)

In his opposition memorandum (Doc. No. 108), Eaton identifies and briefs the following "constitutional" deprivations:  an application of excessive force at the China Hill Restaurant (Opp'n Mem. at 3-4 & 15);  arrest and detention in the absence of probable cause (id. at 4-5);  two incidents involving use of excessive force at the jail (id. at 10 & 15);  and denial of medical care (id. at 15 & 16).  In the middle of addressing these items, Eaton pauses to discuss the Maine Tort Claims Act.  (Id. at 11-12.)

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light

14

most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

For reasons that follow, I conclude that Eaton succeeds in raising genuine issues of material fact in support of his claims for violation of his Fourth Amendment and Fourteenth Amendment rights, based on the restaurant incident and the abuse allegedly meted out by four individuals in his cell, and that state law claims against the individual defendants also remain for trial.  However, I also conclude that summary judgment should be granted against the municipal liability claims and supervisory liability claims and that certain defendants are entitled to an entry of judgment dismissing them from the case.

A.      **Federal Claims**

The individual County Defendants invoke qualified immunity in support of the motion. Some also protest that they cannot be included as defendants based on their lack of personal involvement.  Hancock County and the Hancock County Jail assert an absence of evidence that any custom or policy resulted in the alleged violations.  The Sheriff and the Jail Administrator deny the existence of evidence that would make them complicit in any alleged transgression against Mr. Eaton.  The following discussion explains why Eaton has generated trial-worthy issues concerning the alleged deprivation of his rights under the Fourth Amendment and the Fourteenth Amendment.  From there, the discussion addresses which individual officers are susceptible to trial on which claims, including consideration of the conspiracy theory.  For those officers implicated by the claims, the qualified immunity defense is considered.  Next, municipal

15

and supervisory liability is considered.  Finally, the discussion explains why there is no claim

under 42 U.S.C. § 1985 against any defendant.

> **1.      There are genuine issues concerning the alleged violations of clearly established Fourth Amendment and Fourteenth Amendment rights**

Eaton alleges that his Fourth Amendment rights were violated because he was subjected

to an unreasonable arrest and because the arrest was effectuated with excessive force.  Eaton's

summary judgment presentation raises genuine issues on both claims.  Eaton also alleges a

violation arising under the Due Process Clause based on the treatment he received while detained

in a prison cell.  Eaton's summary judgment presentation raises genuine issues here as well,

based *not* on a denial of medical care but on an alleged application of force following his request

for medical care.[8]

> *a.      Unreasonable arrest under the Fourth Amendment*

The Fourth Amendment conditions the arrest and seizure of a person on the existence of a

warrant or probable cause to believe that an offense is being, or has been, committed.  <u>Alexis v.

McDonald's Rest.</u>, 67 F.3d 341, 349 (1st Cir. 1995).  Probable cause exists if the facts and

circumstances within an officer's knowledge and of which the officer has reasonably trustworthy

information are sufficient to lead a person of reasonable caution to formulate a belief that a crime

---

[8]      Mr. Eaton's claims are asserted under Section 1983 of the Civil Rights Act.  This statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Section 1983 enables individuals to pursue civil actions to vindicate federal constitutional and federal statutory rights when they have suffered a deprivation at the hands of a state actor.  <u>Id.</u>

16

is being committed.  Id. (paraphrasing Carroll v. United States, 267 U.S. 132, 162 (1925)).  "The constitutionality of a warrantless arrest 'depends . . . upon whether, at the moment the arrest was made, the officer[] had probable cause to make it.'"  Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  "[T]hough probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict."  Id.  "Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law."  Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).

According to the County Defendants, Deputy Lepper had probable cause to arrest Eaton for disorderly conduct and for criminal threatening.  Under Maine law, disorderly conduct includes intentionally or recklessly causing annoyance to others by engaging in fighting in a public place without license or privilege or knowingly accosting, insulting, taunting or challenging another with offensive, derisive or annoying words having a tendency to cause a violent response by an ordinary person.  17-A M.R.S. § 501 (2006).  Criminal threatening consists of conduct by which a person intentionally or knowingly places another in fear of imminent bodily injury.  Id. § 209.  The Defendants assert that probable cause to arrest existed under both statutes because Eaton physically threatened Deputy Lepper and his companion.[9] However, there is a genuine issue as to whether or not Eaton threatened the men when they accosted him outside the restaurant.  Eaton's testimony is that he did not threaten anyone and that

---

[9]       The County Defendants do not argue that Eaton berated Deputy Lepper or anyone else with "fighting words" that might independently support a probable cause finding as to disorderly conduct.  See State v. Griatzky, 587 A.2d 234, 237-38 (Me. 1991) (upholding conviction for disorderly conduct where defendant shouted what the Court characterized as "egregious" obscenities at a police officer in response to an order to disperse, and distinguishing State v. John W., 418 A.2d 1097 (Me. 1980) (vacating conviction for disorderly conduct and observing that police officers are expected to exercise a higher degree of restraint in response to what might otherwise amount to fighting words)).  The County Defendants do not assert that Eaton spoke any fighting words.
          Nor do the County Defendants assert that probable cause existed to arrest Eaton on any lesser "related crime" pursuant to the "related crimes defense."  See Sheehy v. Town of Plymouth, 191 F.3d 15, 19-20 (1st Cir. 1999).

he was apprehensive himself about being harmed.  Eaton admits assuming a fighting stance, but

that does not rule out an inference that he assumed a defensive and non-threatening posture.  Had

Eaton assumed a fighting stance against a uniformed officer, this would be a different case.  See

Sheehy v. Town of Plymouth, 191 F.3d 15, 23 (1st Cir. 1999) (stating in *dicta* that advancing on

an officer and displaying aggressive body language would support a probable cause finding for

disorderly conduct under Massachusetts law).  However, the facts for purposes of summary

judgment call for a finding that Deputy Lepper was out of uniform, did not show a badge, and

did not announce an intention to make an arrest.

In sum, on one version of the facts, there was no act of provocation by Eaton that would

have justified a person of reasonable caution in forming a belief that Eaton was committing the

crime of disorderly conduct or the crime of criminal threatening when he assumed a defensive

stance, fearing an application of force by two unknown individuals, not in police uniform, who

thereupon grabbed him "out of the blue," as Eaton put it in his deposition testimony.  A

reasonable jury could find that Deputy Lepper lacked probable cause to take Eaton into

custody.[10]  It was clearly established long before 2006 that probable cause was needed to support

Eaton's warrantless arrest and, accepting for present purposes that there was no threatening

conduct, Deputy Lepper would have been on fair notice that arresting Eaton would offend the

Fourth Amendment.  Vargas-Badillo v. Diaz-Torres, 114 F.3d 3, 5 (1st Cir. 1997).  See also

Prokey v. Watkins, 942 F.2d 67, 73 (1st 1991) ("Whether . . . a reasonable policeman, on the

basis of the information known to him, could have believed there was probable cause is a

question of law, subject to resolution by the judge not the jury.  Nevertheless, if what the

---

[10]     The First Circuit affirmed judgment on a jury verdict in favor of a plaintiff on a Section 1983 claim of
unlawful arrest, rejecting an invocation of qualified immunity, in Iacobucci v. Boulter, a case involving arrest on a
charge of disorderly conduct under a similar Massachusetts law.  193 F.3d 14, 24-25 (1st Cir. 1999).

policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder.").

> b.   *Excessive force under the Fourth Amendment*

"To establish a Fourth Amendment excessive force claim, a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009).  Criteria for assessing an excessive force claim include "'the severity of the crime at issue,' the extent (if any) to which 'the suspect poses an immediate threat to the safety of the officers or others;' and whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

Accepting Eaton's version of events as true, forcing him to the ground would appear an unwarranted act, let alone applying pain compliance severe enough to dislocate his shoulder. The record is capable of supporting a finding of a violation of a clearly established right in this context.  Morelli, 552 F.3d at 23-24;  Jennings v. Jones, 499 F.3d 2, 4 (1st Cir. 2007);  Alexis, 67 F.3d at 353-54.

> c.   *Wanton infliction of pain under the Fourteenth Amendment*

Because Eaton was a temporary detainee at the jail rather than a convicted inmate, his claim for alleged physical abuse in his cell arises under the Due Process Clause of the Fourteenth Amendment rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).  The protection extended to pretrial detainees under the Fourteenth Amendment is at least equal to the protection that the Eighth Amendment extends to convicted inmates.  Id. ("Pretrial detainees are protected under the

19

Fourteenth Amendment Due Process Clause rather than the Eighth Amendment;  however, the standard to be applied is the same as that used in Eighth Amendment cases.").  In the prison context, the Eighth Amendment is violated when jail officers subject an inmate to "the unnecessary and wanton infliction of pain."  Whitley v. Albers, 475 U.S. 312, 319 (1986); Estelle v. Gamble, 429 U.S. 97, 103 (1976).  The claim requires a showing that force was applied "maliciously and sadistically for the very purpose of causing harm."  Whitley, 475 U.S. at 320-21 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied sub nom, John v. Johnson, 414 U.S. 1033 (1973)).  It is generally recognized that the evidence must demonstrate that a condition was imposed on the detainee to punish rather than for some other legitimate reason.  O'Connor v. Huard, 117 F.3d 12, 16 (1st Cir. 1997) (concerning "conditions of confinement").

The County Defendants characterize this claim as based, exclusively, on the denial of medical care.  The Due Process Clause requires the government to provide medical care to a pretrial detainee who is injured while being apprehended by the police.  Gaudreault v. Mun. of Salem, 923 F.2d 203, 208 (1st Cir. 1990).  In order to offend the Constitution by denying medical care to a prisoner, there must be "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Gamble, 429 U.S. at 105-06.  Deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'"  Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir. 2006)).  "[A] prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Burrell, 307 F.3d at 8 (quoting Farmer v. Brennan, 511 U.S.

20

825, 837 (1994)).  "A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Gaudreault, 923 F.2d at 208.

The County Defendants assert that Eaton's claim necessarily fails because he "did not display any needs so patent as to make lay persons such as Defendants Haines, Gunn, Weaver, Sullivan, and Hobbs, remiss in failing to arrange for immediate medical attention."  (Mot. at 18.) I agree with that assessment.  In addition, the denial of medical care claim suffers from the absence of evidence that delayed access to medical attention somehow exacerbated Eaton's injuries.  See Gaudreault, 923 F.2d at 208-209.  I conclude on the basis of the summary judgment record that none of the County Defendants are liable on a "denial of medical attention" claim. However, accepting as true for summary judgment purposes that OC spray was applied to Eaton and that he was kicked in an application of force involving three or four officers after he began to call for medical assistance, Eaton has raised a genuine issue as to the violation of a clearly established Fourteenth Amendment right to be free from an unnecessary and wanton infliction of pain.  If force was applied as Eaton contends it was, there is no evident justification for it and a reasonable inference would be that it was administered punitively, particularly if he was told that he "deserved" the abuse.  In addition to Gunn, Haines, and Weaver, Deputy Lepper is also subject to this claim.[11]  Eaton's deposition testimony was to the effect that there was a fourth man in camouflage clothing and that he is "90 percent sure" that the man was Deputy Lepper.  (Eaton Dep. at 92.)  The finder of fact should be permitted to weigh this testimony to judge how reliable it is.

---

[11]     The record reflects that Gunn, Haines, and Weaver were the three corrections officers who entered Eaton's cell.  (CDSMF ¶¶ 175 & 179, citing Gunn Dep. at 48 and Haines Dep. at 41;  PAS ¶ 39, citing Eaton Dep. 96-97.)

2.      The qualified immunity defense

The Supreme Court's opinions "consistently have held that government officials are entitled to some form of immunity from suits for damages.  As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "In the last analysis, . . . qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct."  Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999).  In this way, the doctrine of qualified immunity protects a state actor from litigation in circumstances where the proper application of the underlying constitutional standard is unclear and, therefore, not otherwise suited for dismissal or summary disposition.

The qualified immunity test has two elements:  "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing, *inter alia*, Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)).  The second element can be broken down into two tests:  (1) whether the contours of the right are sufficiently clear that a reasonable state actor would appreciate that his conduct was placing a constitutional right in jeopardy; and (2) whether the officer would have understood that the right in question would actually be violated in light of the specific or concrete facts of the case.  Together, the tests address "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Id.;  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) ("Qualified immunity shields an officer from

22

suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

Assuming for summary judgment purposes that the "specific or concrete facts" are the facts described by Mr. Eaton, Deputy Lepper had fair warning that his conduct was in violation of the Constitution's prohibition against unreasonable warrantless arrest and the use of excessive force. Similarly, Gunn, Haines, Lepper and Weaver had fair warning that the force allegedly applied to Eaton in his cell would violate the prohibition against wanton infliction of pain. Therefore these defendants are not entitled to summary judgment based upon qualified immunity.

### 3.    Summary judgment should enter on behalf of certain officers

The complaint in this action does nothing to sort out the several defendants in a claim-by-claim manner. It is appropriate to address that shortcoming at the summary judgment stage. Based on my assessment of the summary judgment record, summary judgment should enter in favor of all of the County Defendant except Deputy Lepper with respect to the Fourth Amendment claims arising from events that transpired at the restaurant. In addition, summary judgment should enter in favor of Defendants Hobbs, Morang, and Sullivan with respect to the Fourteenth Amendment claim for wanton infliction of pain.

> *a.    Defendants Gunn, Haines, Hobbs, Morang, Sullivan, and Weaver are entitled to judgment against the Fourth Amendment claims.*

Among the several deputies and correctional officers of Hancock County whom Mr. Eaton has sued in this action, only Deputy Lepper is discussed as an appropriate state-actor defendant with regard to the arrest at the China Hill Restaurant and the application of force associated with that arrest. (Opp'n Mem. at 3 ("This case involves the use of excessive force at

the China Hill Restaurant by Defendants Jason Lepper [and private individuals].") & 4 ("This case also involves false arrest and false imprisonment at the China Hill Restaurant by Jason Lepper.").)

> b. *Defendants Hobbs, Morang, and Sullivan are entitled to summary judgment against the Fourteenth Amendment claim.*

According to Eaton, there were four men in his cell, including Deputy Lepper. The County Defendants assert that there were three officers in the cell, not including Lepper. The record reflects that Gunn, Haines, and Weaver were the three officers who entered Eaton's cell. (CDSMF ¶¶ 175 & 179, citing Gunn Dep. at 48 and Haines Dep. at 41;  PAS ¶ 39, citing Eaton Dep. 96-97.)  The parties have not pointed to any evidence that another corrections officer participated in this alleged abuse or observed it.[12]  Under the "conspiracy" heading of his opposition memorandum, Eaton argues that every officer in the jail is liable for failing to intervene on his behalf to obtain medical attention, but I have already concluded that Eaton fails to raise a genuine issue in support of a claim premised on the denial of medical attention, as compared with a claim premised on the wanton infliction of pain by an application of force.  As for the latter theory, the Court's judgment should reflect that Crystal Hobbs, Robert Morang, and Heather Sullivan are not subject to liability because there is no apparent evidentiary basis in the summary judgment record to support an inference that they had any opportunity to intervene or that they conspired with the others in relation to the alleged abuse in the cell.

---

[12]      Eaton admits a statement to the effect that Weaver did not spray Eaton with mace and did not observe anyone else spray Eaton or hit or kick Eaton.  (POS ¶¶ 210, 212.)  I infer from the layout of the County Defendants' statement of material facts that Eaton's admissions are limited to Weaver's non-association with events in the nurse's station and that Eaton's admission does not compromise his claim against Weaver in regard to the alleged abuse in the cell.

Eaton argues that, even though Sullivan did not use any force against his person or observe any force being applied to him, she shares liability for any force applied to him because she had supervisory rank over the other officers that night.  Despite her relative rank, there is no evidence that Sullivan conspired with any other officers to deprive Eaton of his rights.  Nor is there any evidence that she stood by and had occasion to intervene during an application of force that might offend the Fourteenth Amendment.  Sullivan had some involvement with the decision to change Eaton over into a suicide smock, but the record does not demonstrate that the application of force in the nurse's station was injurious to Eaton or that it was devoid of an institutional purpose and intended to inflict pain for purposes of punishment.  Even assuming that these facts related to the nurse's station suggest the possibility of a constitutional violation, the unclear tension between suicide prevention and the liberty of remaining in street clothes during an intoxication hold would afford qualified immunity to Gunn, Haines, and Sullivan for events that took place in the nurse's station.[13]

### c.   *Observations regarding the Section 1983 conspiracy claim (Count V)*

Under a "conspiracy" caption in his memorandum, Eaton argues that any officer who was present at the scene and failed to intervene is liable for "nonfeasance."  This is consistent with the law respecting Section 1983 claims involving excessive force, and would logically extend to a claim involving wanton infliction of pain.  Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 52 (1st Cir. 2005);  Gaudreault, 923 F.2d at 207 n.3.  However, a failure to intervene claim does not require a conspiracy theory.  Failure to intervene is a potential basis for direct liability, as Torres-Rivera and Gaudreault demonstrate.

---

[13]        Eaton's complaint does not assert that excessive force was applied in the nurse's station.  It does reference a strip search (Compl. ¶ 27), but Eaton does not develop a strip search claim in his summary judgment brief.

25

A civil rights conspiracy under Section 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (internal quotation marks and citation omitted). Such an agreement is actionable when there is "an actual deprivation of a right secured by the Constitution and laws." Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980). There is no evidence that any of the corrections officers conspired with Deputy Lepper to deprive Eaton of Fourth Amendment rights in connection with his arrest. In his opposition memorandum, Eaton does not even suggest any such conspiracy. Nor is there any evidence that Hobbs, Morang, and Sullivan were party to an agreement to punish Eaton with physical abuse at the jail due to complaints he made about the treatment he received that night and his need for medical attention.

The County Defendants argue in their motion that they are entitled to summary judgment against the claim (Count V) that they participated in a conspiracy in violation of Section 1983. (Mot. at 20-21.) Despite the conclusions stated in the preceding paragraph, I recommend that the Court not enter summary judgment across the board for every individual County Defendant on Count V, because a conspiracy can be shown through circumstantial evidence, Earle, 850 F.2d at 844, and the finder of fact might reasonably infer the existence of a conspiracy among those County Defendants whom I have concluded are not otherwise entitled to summary judgment. For example, Eaton's testimony that Lepper was present in the cell, if credited, is strong circumstantial evidence of a prior agreement among certain individual defendants to inflict a wrong or injury on Eaton. It would be difficult to understand Deputy Lepper's presence in the cell except in connection with a plan to punish Eaton.

26

4.        **Municipal liability**

The County Defendants request that summary judgment enter against the federal claims

to the extent they are asserted against the County.  This would include the claims against

Hancock County and the Hancock County Sheriff's Department, as well as the claims against

Sheriff Clark and Administrator Dannenberg to the extent they are sued in their official

capacities.[14]  Burrell, 307 F.3d at 2 (observing that suit against an official in an official capacity

"is tantamount to a suit against the entity of which the official is an agent").

Under Section 1983, municipalities cannot be held liable for constitutional violations

perpetrated by municipal employees simply because they are the employers and have conferred

state-actor status upon their employees.  Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008)

(citing Monell v. Dept. of Soc. Servs., 436 U.S. 658, 691 (1978)).  Section 1983 claims against a

properly named municipal defendant will only be successful if that entity was responsible for a

policy, custom, or practice that caused the violation alleged.  Id.  Assuming the presence of an

underlying deprivation, proof of a municipal custom or policy claim involves two additional

elements:

> First, the custom or practice must be attributable to the municipality, i.e., it must
> be "so well settled and widespread that the policymaking officials of the
> municipality can be said to have either actual or constructive knowledge of it yet
> did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st
> Cir. 1989).  Second, the custom must have been the cause of and "the moving
> force" behind the deprivation of constitutional rights.  Id. at 1157.

Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir. 2000).  The first of these additional elements

is sometimes referred to as "deliberate indifference," particularly in the context of a failure to

train theory.  Young v. City of Providence, 404 F.3d 4, 26 (1st Cir. 2005).

---

[14]        Mr. Eaton sues all of the individual defendants in their "personal and professional capacities."  (Compl. ¶¶
4-12.)

The County Defendants argue that summary judgment should enter because "there is no evidence that there were any unconstitutional policies, customs or practices at the Hancock County Jail regarding the use of force, methods of imprisonment, or medical care."  (Mot. at 23.)  In opposition, Mr. Eaton argues that the County is liable because Jail Administrator Dannenberg has given testimony to the effect that he, personally, is not trained in jail policy and procedure.  (Opposition Mem. at 7-8.)  In addition, Mr. Eaton asserts that Sheriff Clark did not adequately investigate this incident and never disciplined the deputies and corrections officers involved.  (Id. at 8.)  He references a failure to train theory, as well.  (Id.)  These arguments concern alleged shortcomings in the supervisory oversight of Sheriff Clark and Administrator Dannenberg.  They do not describe a policy, custom, or practice of using excessive force against intoxicated, back-talking detainees.

The record reflects that the Sheriff's Department has a use of force policy in place for the Sheriff and his deputies, Policy 2-1 (Clark Aff. Ex. B, Doc. No. 83-15) and an analogous policy in place for corrections officers at the jail, Policy D-241 (Clark Aff. Ex. C, Doc. No. 83-16).  Eaton does not contend that either policy is designed in a manner that is likely to result in the violation of constitutional rights.  The County Defendants state that no instruction or direction is given to deputies or the jail staff regarding the use of force that is inconsistent with the contents of the applicable policies.  (CDSMF ¶¶ 228, 234.)  Eaton denies the same, but his citations in opposition do not controvert it.  (POS ¶¶ 228, 234, citing Clark Dep. at 30, 39-40.)  Eaton has not demonstrated what other evidentiary basis there might be in the record to infer that a custom or practice was the moving force behind the deprivations he alleges.[15]

---

[15]     Eaton references another recent case in this Court, Harriman v. Hancock County, which involved another intoxicated detainee held at the Hancock County Jail roughly one month prior to Eaton's visit.  This Court is familiar with that case because it adopted a recommended decision granting summary judgment against Mr. Harriman's

As far as failure to train is concerned, Eaton must cite record evidence capable of raising a genuine issue of deliberate indifference to the deprivation of constitutional rights.   In the absence of any evidence of a pattern of previous and similar violations, the evidence must justify an inference that the use of excessive or punitive force was a "highly predictable consequence" of the County's failure to supplement the training of its officers.  <u>Young</u>, 404 F.3d at 28.  The deliberate indifference standard is "exceptionally stringent" and has been characterized as requiring a showing that the use of excessive force would be a "plainly obvious consequence" of a municipal act or omission.  <u>Crete v. City of Lowell</u>, 418 F.3d 54, 66 (1st Cir. 2005).

As already discussed, the focus in this case falls on Deputy Lepper and corrections officers Gunn, Haines, and Weaver.  It is undisputed that Deputy Lepper received training in the use of force from both the Municipal Academy and the State Police Academy.  (CDSMF ¶ 6.) He attended the latter program in 2003.  (<u>Id.</u> ¶ 4.)  It is also undisputed that Deputy Lepper received training on the Hancock County Sheriff's Department's Policies and Procedures in November 2004, January 2005, and April 2006.  (<u>Id.</u> ¶ 9.)

Heather Sullivan and Ryan Haines have testified that the County did not provide annual training to its corrections officers concerning the use of force, but that the officers all received training from the Maine Criminal Justice Academy.  Haines received training concerning the use of force from the Maine Criminal Justice Academy in 2000 and 2001 and he was required to review the jail's policies upon being rehired as a corrections officer in 2006, having left the

---

claims of excessive force and inattention to medical needs.  No. 08-CV-122-B-W, 2009 U.S. Dist. Lexis 53129, 2009 WL 902073 (Mar. 31, 2009) (Mag. J. Rec. Dec.), adopted, 2009 U.S. Dist. Lexis 72668, 2009 WL 2508160 (D. Me. Aug. 17, 2009).)  Both Eaton and Harriman retained the same counsel.  Harriman's case suffered from significant problems that Eaton's case does not share.  In particular, Harriman had essentially no memory of his visit to the jail.  The facts in that case indicated that Harriman had fallen down and it was admitted that he had seizures while in his cell.  There was no evidence that injuries to his person were inflicted for purposes of punishment. Consequently, the <u>Harriman</u> facts do not inform the municipal liability analysis in this case.

position between 2003 and 2006.  (Id. ¶¶ 18-21, 23.)  Sullivan's deposition testimony was to the effect that Academy training addresses use of force and that the training "pretty much mirror[s]" Jail Policy D-241.  (Sullivan Dep. at 6-7.)

Joshua Gunn joined the corrections staff in 2005.  As a consequence, his training in the use of force from the Maine Criminal Justice Academy was fresh.  He received some of this use of force training in September 2006, not long before Eaton visited the jail, and additional training prior to that date.  (CDSMF ¶¶ 27, 29-30.)  John Weaver was a new recruit at the time of Eaton's visit, having joined the corrections staff on October 14, 2006.  (Id. ¶ 25.)  He avers that he received some training from the Sheriff's Department, including use of force training and policies and procedures training.  (Id. ¶ 26, citing Weaver Aff. ¶ 3.)  Eaton denies the assertion, relying on deposition testimony from Sullivan, Haines, and Administrator Dannenberg.  (POS ¶ 26.)  The testimony Eaton cites from Sullivan does not controvert Weaver's averment.  Sullivan was asked whether there was jail-based follow-up training *after* a corrections officer attends the Maine criminal justice program and denied any such training.  (Sullivan Dep. at 7.)  The cited portion of Sullivan's deposition transcript does not address any preliminary instruction of new hires prior to attendance at the Maine Criminal Justice Academy.  The cited portion of Haines's deposition transcript does not address the issue either.  (Haines Dep. at 27-28).  The cited portion of a Dannenberg deposition held in the Harriman case is to the effect that "use of force is taught at the Academy," and is otherwise unclear about whether the jail offers any instruction or training concerning use of force to new hires prior to their attendance at the Academy.  (Nov. 4, 2008, Dannenberg Dep. at 61-62, Doc. No. 42 in Case No. 08-122.)

In a more recent deposition, Administrator Dannenberg testified that he, personally, has not received training from the Academy or attended courses on jail administration.  Dannenberg

30

has testified that he is an administrator, not a corrections officer, and that he relies on his lieutenants when it comes to understanding the standards that corrections officers must follow. (PAS ¶¶ 25-27, citing July 24, 2009, Dannenberg Dep. at 26, Doc. No. 60.)  Dannenberg denied having any specific knowledge of the Department's excessive force policy.  (Id. ¶ 32.)

This evidence is not sufficient to demonstrate deliberate indifference on the part of Hancock County because it does not justify an inferential finding that the use of excessive or punitive force was a "highly predictable consequence" of an obvious shortcoming in training. Stated otherwise, this is not the kind of failure to train case where the training regime is so inherently defective that Eaton can prove his case without adducing evidence of a pattern of similar violations.  Eaton has attempted to demonstrate a pattern with his reference to the Harriman case (see, *supra*, note 15).  However, that case does not offer a reliable insight into the treatment of intoxicated prisoners at the Hancock County Jail.  Summary judgment should enter in favor of the County Defendants with respect to the municipal liability claims.

### 5.    Supervisory Liability

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009).  A plaintiff must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Id. at 1948-49.  Mere knowledge of a subordinate's wrongful conduct does not establish Section 1983 liability for a supervisor.  Rather, there must be an affirmative link between the conduct of the supervisor and the constitutional deprivation experienced by the plaintiff.  See Sanchez v. Pereira-Castillo, 590 F.3d. 31, 49 (1st Cir. 2009);  Maldonado, 568 F.3d at 274-75;  Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005).  Examples of affirmative links include "supervisory

encouragement, condonation or acquiescence" in relation to the deprivation.  Maldonado, 568 F.3d at 275 (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)).  Deliberate indifference can also result in supervisory liability.  Id.  This case lacks evidence of an affirmative link between Sheriff Clark or Administrator Dannenberg and the events that transpired with respect to Mr. Eaton.  There is no evidence of encouragement, condonation or acquiescence concerning excessive or punitive applications of force.  Nor is there evidence sufficient to support a finding of deliberate indifference, for reasons stated in regard to municipal liability and failure to train.  Summary judgment should enter in favor of Sheriff Clark and Administrator Dannenberg with respect to the supervisory liability claims.

**6.      There is no claim under 42 U.S.C. § 1985(3)**

Section 1985(3) prohibits two or more persons from conspiring to deprive another person or class of persons of equal protection.  Perez-Sanchez v. Public Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008).  A claimant seeking relief under the statute must prove the existence of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."  Id. (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).  Eaton has not presented any evidence that would raise a genuine issue of this kind.  Summary judgment should enter for the County Defendants on Count IV.

**B.      State Law Claims**

Eaton's action includes claims for assault, false arrest, false imprisonment, negligent infliction of emotional distress, and negligence.  (Compl. Counts II, III, VIII.)  The County Defendants argue that the individual deputies and officers are entitled to summary judgment because they enjoy discretionary function immunity under the Maine Tort Claims Act (MTCA).  (Mot. at 26.)  They also argue that any claims against the County, the Sheriff's Department or the

Sheriff and Administrator in their official capacities should be dismissed based on the sovereign immunity provisions of the MTCA.  (Id. at 27-30.)

### 1.  Governmental immunity

Pursuant to the MTCA:  "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages."  14 M.R.S. § 8103(1).  Among the exceptions to this grant of immunity are an exception for negligence in the operation of a public building and an exception for negligence in the discharge of "smoke, vapors, soot, fumes, acids, alkalines, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants."  Id. § 8103(2), (3).  Mr. Eaton asserts both exceptions in his opposition memorandum.  (Opp'n Mem. at 12.)  Neither exception applies.  The application of force by Deputy Lepper obviously has nothing to do with the operation of a public building or the release of chemicals.  The application of force by the corrections officers, although it transpired in a public building, was not equivalent to operation of a public building.  Nor did the application of OC spray amount to a discharge of pollutants because the pollutant exception requires that the discharge be sudden and accidental.  Moreover, the exception requires a discharge "into or upon land, the atmosphere or any water course or body of water."  14 M.R.S. § 8104-A(3).  "[E]ven explicit waivers are construed narrowly" when it comes to sovereign immunity.  Knowlton v. Att'y Gen., 2009 ME 79, ¶ 12, 976 A.2d 973, 977;  see also Reid v. Town of Mt. Vernon, 2007 ME 125, ¶ 20, 932 A.2d 539, 545 ("Statutory exceptions to the doctrine of sovereign immunity must be strictly construed.").  Mr. Eaton's assertion of these two exceptions would require a very relaxed reading that is not in keeping with this rule of construction.

The remaining aspect of the sovereign immunity defense concerns the issue of whether Hancock County may have waived sovereign immunity to the extent of any insurance coverage it may have obtained.  Pursuant to the MTCA:  "If the insurance provides coverage in areas where the governmental entity is immune, the governmental entity shall be liable in those substantive areas but only to the limits of the insurance coverage."  14 M.R.S. § 8116.  "[T]he governmental entity against whom a claim is made bears the burden of establishing that it does not have insurance coverage for that claim."  Danforth v. Gottardi, 667 A.2d 847, 848 (Me. 1995).  The County Defendants have offered statements of material fact supported by record citations that demonstrate the following:

> 241. The Maine County Commissioners Association Self-Funded Risk Management Pool (Risk Pool) is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117.  *Affidavit of Malcolm Ulmer, ¶ 2 [(Doc. No. 83-9)].*

> 242. Hancock County is a Named Member of the Risk Pool and is provided with insurance-type coverage pursuant to a document entitled "Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document" ("Coverage Document").  *Affidavit of Malcolm Ulmer, ¶ 3; Affidavit of Cynthia DePrenger, ¶ 3 [(Doc. No. 83-5)].*

> 243. The Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act.  *Ulmer aff.,¶¶ 4-7; Exhibit G [(Doc. No. 83-20)].*

> 244. Other than the insurance-type coverage provided to Hancock County under the Risk Pool's Coverage Document, Hancock County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act.  *Ulmer aff., ¶ 8;  DePrenger aff., ¶ 4.*

Mr. Eaton has objected to these statements and requests that they be stricken, in the following language:

> Request to strike.  The Affidavit of Malcolm Ulmer and the information contained
> therein were not listed in Defendants' Disclosures.  Defendants' Interrogatory
> answers yield little insurance information and none regarding Mr. Ulmer as a
> witness in Interrogatory Answer Number 4.  Finally, the Affidavit was filed
> beyond the discovery deadline and contains hearsay information and is irrelevant.

The County Defendants concede that Mr. Ulmer and Ms. DePrenger were not disclosed as witnesses and agree that, in the future, it would be better practice to disclose the claims manager for the Maine County Commissioners Association Self-Funded Risk Management Pool and the County Clerk as witnesses, even though neither would ever be apt to appear as a witness at trial to address the insurance issue.  However, they do attest to having disclosed the Coverage Certificate (Ex. G), and Mr. Eaton's objection does not suggest otherwise.  They also point to the Harriman decision, which concerned events happening one month prior to the events in this case, where this Court indicated that there was no insurance available.  (CDRS ¶ 241-244; see Harriman v. Hancock County, No. 08-CV-122-B-W, 2009 U.S. Dist. Lexis 53129, *71 n.24, 2009 WL 902073, *20 n.24 (Mar. 31, 2009) (Mag. J. Rec. Dec.), adopted, 2009 U.S. Dist. Lexis 72668, 2009 WL 2508160 (D. Me. Aug. 17, 2009).)  Mr. Eaton does not explain why insurance would be available for his claims based on a reading of the Certificate.  Nor does he explain the harm that would befall him if the statements related to insurance are not stricken.

It is not hearsay for these witnesses to relate whether or not Hancock County has insurance that would extend to circumstances in which immunity would normally apply. Moreover, authentication testimony is not hearsay.  The hearsay objection is overruled. As for the request to strike based on a disclosure violation, such a sanction is permissible under Rule 37(c)(1), unless the failure was substantially justified or is harmless.  I decline to impose the requested sanction.  Pursuant to the MTCA, immunity is only waived and damages can only be recovered to the extent there is insurance available for an incident to

35

which immunity would apply.  14 M.R.S. § 8116.  In this context, the failure to disclose

Mr. Ulmer and Ms. DePrenger as witnesses is harmless, particularly where the Coverage

Certificate was disclosed.  Counsel does not contend that an opportunity was missed to

discover facts pertaining to the Section 8116 insurance/immunity question.  Counsel

familiar with the MTCA, like Mr. Eaton's counsel, should not be surprised or prejudiced

by a failure to disclose this kind of witness.

### 2.  State employee immunity

The MTCA extends immunity to state employees on claims arising from discretionary

acts or omissions, whether the acts are classified, for purposes of tort law, as negligent or

intentional acts, and whether or not the discretion is abused.  14 M.R.S. § 8111(1)(C);  Grossman

v. Richards, 1999 ME 9, ¶¶ 4-5, 722 A.2d 371, 373.  "The absolute immunity provided by

paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the

duties of the governmental employee in question."  14 M.R.S. § 8111(1).

Four criteria govern whether an act or omission qualifies as discretionary.[16]  However,

the Law Court has explicitly held that, if an officer uses excessive force, "such action is beyond

the scope of the officer's discretion."  Richards v. Town of Eliot, 2001 ME 132, ¶ 32, 780 A.2d

281, 292.  This Court has extended that rationale to a Fourteenth Amendment claim in the prison

---

[16]     The factors are:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental
policy, program or objective?  (2) Is the questioned act, omission, or decision essential to the
realization or accomplishment of that policy, program, or objective as opposed to one which
would not change the course or direction of the policy, program, or objective?  (3) Does the act,
omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on
the part of the governmental agency involved?  (4) Does the governmental agency involved
possess the requisite constitutional, statutory, or lawful authority and duty to do or make the
challenged act, omission, or decision?

Quintal v. City of Hallowell, 2008 ME 155, ¶ 34, 956 A.2d 88, 96-97.

context.  Parlin v. Cumberland County, 659 F. Supp. 2d 201, 214 (D. Me. 2009).  The tort claims recited in Count II should proceed to trial because they dovetail with the constitutional claims.  However, summary judgment should enter on Count II for those corrections officers who are not subject to the constitutional claims because there is no evidence that they exceeded their discretion in relation to the treatment of Mr. Eaton.

In addition, summary judgment should enter for all of the individual defendants on Count III.  Count III recites a claim of negligent infliction of emotional distress.  The Law Court has held that a claim of negligent infliction of emotional distress is appropriately dismissed in the context of a state law excessive force (assault and battery) claim that survives discretionary function immunity because the emotional distress claim is subsumed within the excessive force claim.  Richards, 2001 ME 132, ¶ 34, 780 A.2d at 293.  See also McDermott v. Town of Windham, 204 F. Supp. 2d 54, 71 (D. Me. 2002).

### 3.  Punitive damages

Finally, the County Defendants request an entry of summary judgment on the claim for punitive damages to the extent any claim is asserted against Hancock County, the Hancock County Sheriff's Department, and Sheriff Clark and Administrator Dannenberg, in their official capacities.  (Mot. at 30.)   Under the MTCA, "no judgment against a 'government entity' may include punitive damages."  Rippett v. Bemis, 672 A.2d 82, 89 (Me. 1996) (citing 14 M.R.S. § 8105(5)).  If the governmental County Defendants were not already immune to the tort claims, it would be appropriate to order that they are not subject to punitive damages.  As they are immune with respect to the underlying tort claims, there is no need to issue such an order.[17]

---

[17]     The County, the Department, and Sheriff Clark and Jail Administrator Dannenberg in their official capacities are also "immune from punitive damages under 42 U. S. C. § 1983."  Newport v. Fact Concerts, 453 U.S. 247, 271 (1981);  Martinez-Velez v. Rey-Hernandez, 506 F.3d 32, 39 n.3 (1st Cir. 2007).  The punitive damages

## CONCLUSION

For reasons set forth above, I RECOMMEND that the Court GRANT the County

Defendants' motion for summary judgment (Doc. No. 82), IN PART, as follows:

Enter judgment dismissing Hancock County, the Hancock County Sheriff's Department, Sheriff Clark, and Jail Administrator Dannenberg;

Enter judgment dismissing Deputy Morang and Corrections Officers Hobbs and Sullivan from the case;

Enter judgment in favor of Defendants Gunn, Haines, and Weaver on the Fourth Amendment claim (Count I);

Enter judgment dismissing Count III (negligent infliction of emotional distress);

Enter judgment dismissing Count IV (42 U.S.C. § 1985(3)).

In all other respects, I recommend that the motion be denied.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

April 16, 2010

---

count should remain for purposes of the claims against Deputy Lepper and Corrections Officers Gunn, Haines, and Weaver.  The County Defendants do not address the Section 1983 or the state law punitive damages standards in their motion, but merely state that "excepting the excessive force claims, there is no evidence that these Defendants acted with the necessary state of mind required for the imposition of punitive damages."  (Mot. at 30.)