UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| RONALD EATON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CV-08-370-B-W |
| ) | |
| HANCOCK COUNTY, et. al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**ORDER AFFIRMING THE MAGISTRATE JUDGE'S
RECOMMENDED DECISION**

Getting drunk and acting out is not, by itself, a crime. Ronald Eaton claims he was arrested, incarcerated, and beaten for just that, and accordingly, he seeks damages against Hancock County and the County employees he claims were responsible. In a careful and well-researched decision, the Magistrate Judge recommended that the Court deny most of the Defendants' Motion for Summary Judgment. After both the County Defendants and Mr. Eaton objected, the Court performed a *de novo* review and concludes that the Magistrate Judge was correct.

## I. STATEMENT OF FACTS

### A. Procedural History

On October 29, 2008, Ronald Eaton filed a complaint against Hancock County and other governmental and individual defendants claiming damages for personal injuries he allegedly sustained during an arrest and detention. *Compl.* at ¶¶ 34-64 (Docket # 1). The Complaint contains eight counts undifferentiated among the

Defendants: 1) Count One – a Fourth Amendment violation; 2) Count Two – Assault, False Arrest, and False Imprisonment; 3) Count Three – Negligent Infliction of Emotional Distress; 4) Count Four – Conspiracy Under 42 U.S.C. § 1985(3); 5) Count Five – Conspiracy Under 42 U.S.C. § 1983; 6) Count Six – Punitive Damages; 6) Count Seven – Due Process – Fourteenth Amendment; 7) Count Eight – Negligence – Maine Tort Claims Act – Assault.[1] *Id.*

On November 30, 2009, the Defendants moved for summary judgment on all counts.[2] *Cnty. Defs.' Mot. for Summary J.* at 30 (Docket # 82) (*Defs.' Mot.*). Mr. Eaton filed his opposition on December 23, 2009. *Pl.'s Reply to Cnty. Defs.' Mot. for Summ. J.* (Docket # 108) (*Pl.'s Opp'n*). The Court referred the motion to the Magistrate Judge for recommended decision. On April 16, 2010, the Magistrate Judge filed her Recommended Decision and recommended: (1) that the Court grant summary judgment to all defendants on Counts III and IV; (2) that the Court grant summary judgment on Count I for Defendants Gunn, Haines, and Weaver; and, (3) that the Court dismiss all claims against Deputy Morang, Corrections Officer Hobbs, Corrections Officer Sullivan, Hancock County, the Hancock County Sheriff's

---

[1] By unopposed motion dated November 30, 2009, Defendant James Lepper, the father of Deputy Jason Lepper, moved to dismiss Counts I, II, VI, and VII. *Assented to Mot. for Partial Dismissal* (Docket # 77). The Court granted the motion the same day. *Order* (Docket # 78). Still pending against James Lepper are Count III – negligent infliction of emotional distress, Count IV – conspiracy under 42 U.S.C. § 1985(3), Count V – conspiracy under 42 U.S.C. § 1983, and Count VIII – negligence under the Maine Tort Claims Act.

[2] Mr. Eaton also moved for summary judgment. *Pl.'s Mot. for Summ. J.* (Docket # 87). On March 17, 2010, the Magistrate Judge recommended that his motion be denied. *Recommended Dec.* (Docket # 134). Mr. Eaton did not object and on April 6, 2010, the Court affirmed the Magistrate Judge's Recommended Decision. *Order Affirming the Recommended Dec. of the Magistrate Judge* (Docket # 137).

Department, Sheriff Clark, and Jail Administrator Dannenberg. *Recommended Dec.* at 38 (Docket # 138) (*Rec. Dec.*).

On May 14, 2010, Mr. Eaton and Deputy Jason Lepper each objected to the Recommended Decision. *Pl.'s Obj. to the Magistrate's Recommended Dec. and Req. for* De Novo *Review* (Docket # 141) *Pl.'s Obj.; Def. Jason Lepper's Partial Obj. to Recommended Dec. on Mot. for Summ. J.* (Docket # 142) (*Def.'s Obj.*). Mr. Eaton objected to the recommended dismissal of Hancock County, the Hancock County Sheriff's Department, William Clark, and Carl Dannenberg under the theory of governmental immunity and of Crystal Hobbs and Heather Sullivan on the conspiracy claim under 42 U.S.C. § 1983.[3] *Pl.'s Obj.* at 1-10. Deputy Lepper objected to the Magistrate Judge's denial of summary judgment on the unreasonable arrest and excessive force claims and on qualified immunity to the unreasonable arrest and excessive force claims.[4] On June 1, 2010, Hancock County, Hancock County Sheriff's Department, William Clark, Heather Sullivan, Crystal Hobbs, and Carl Dannenberg responded to Mr. Eaton's objection. *Defs. Hancock Cnty., Hancock Cnty. Sheriff's Dep't, William Clark, Heather Sullivan, Crystal*

---

[3] Mr. Eaton did not object to the Magistrate Judge's dismissal of Deputy Morang from the case, the dismissal of Defendants Gunn, Haines and Weaver from Count I, and the dismissal of Defendants James Lepper, Jason Lepper, Stevens, Haines, Sullivan, Gunn, Hobbs, and Weaver from Counts III and IV. The Court AFFIRMS the Magistrate Judge's recommended decision pertaining to those defendants and claims.

[4] Deputy Lepper's Memorandum of Law blurs his objections. The introduction to Deputy Lepper's brief states that he objects to the denial of summary judgment on Mr. Eaton's claims of unreasonable arrest and excessive force and to the denial of summary judgment on Deputy Lepper's invocation of qualified immunity to the claims of unreasonable arrest and excessive force—four separate objections requiring four logically distinct analyses. Deputy Lepper's brief, however, fails to independently discuss the unreasonable arrest claim—possibly because this analysis is inherent in the qualified immunity analysis—and likewise merges the discussions of excessive force and qualified immunity with claims of excessive force. The Court proceeds as if Deputy Lepper independently discussed the unreasonable arrest and excessive force claims and the qualified immunity claims.

*Hobbs and Carl Dannenberg's Resp. to Pl.'s Obj. to the Magistrate's Recommended Dec. and Req. for* De Novo *Review* (Docket # 143) (*Def.'s Resp.*).

**B.    The Facts**[5]

**1.    Ronald Eaton, the China Hill Restaurant, the Volcano Bowl, and Cindy Furrow's Disappearance**

At 5 p.m. on November 5, 2006, Ronald Eaton arrived with his girlfriend, Cindy Furrow, at the China Hill Restaurant ("China Hill") in Ellsworth, Maine. *Defs.' Hancock Cnty., Hancock Cnty. Sheriff's Dep't, William Clark, Jason Lepper, Ryan Haines, Heather Sullivan, Joshua Gunn, Crystal Hobbs, Carl Dannenberg, Robert Morang, and John Weaver's Statement of Material Facts in Support of Mot. for Summ. J.* ¶ 51, 52 (Docket # 83) (DSMF); *Pl.'s Reply to Defs.' Statement of Material Facts, Req. to Strike, and Pl.'s Additional Statement of Material Facts* ¶¶ 51, 52 (Docket # 109) (either PRDSMF or PASMF).  After Mr. Eaton and Ms. Furrow were seated in the lounge, they ordered a meal and a "volcano bowl," a mixed alcoholic beverage consisting of two kinds of rum, Apple Jack brandy, passion syrup, pineapple juice and orange juice and approximately equal to three drinks. DSMF ¶ 54; PRDSMF ¶ 54.  Ms. Furrow tried the volcano bowl but did not like it, and did not drink any more of it.  DSMF ¶ 58; PRDSMF ¶ 58.  Mr. Eaton, who had consumed two beers at home between noon and 2 or 3 p.m., continued to drink the volcano bowl.  DSMF ¶ 55, 59; PRSMF ¶ 55, 59.

---

[5] In accordance with the "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Eaton's theory of the case consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

During dinner, Mr. Eaton and Ms. Furrow got into an argument, which lasted for about twenty to thirty minutes. DSMF ¶¶ 60, 62; PRDSMF ¶¶ 60, 62. During the argument, Ms. Furrow called Mr. Eaton a "jerk," an "idiot," and a "fucking asshole" in a voice loud enough so that others could hear.[6] DSMF ¶ 61; PRDSMF ¶ 61. Ms. Furrow apparently decided she had had enough and left the restaurant under the pretext that she was going to the bathroom. DSMF ¶¶ 60, 62, 63; PRDSMF ¶¶ 60, 62, 63. Ms. Furrow walked to a nearby bar and left there by cab. DSMF ¶ 63; PRDSMF ¶ 63. After Ms. Furrow disappeared, Mr. Eaton became loud and when she did not return, he panicked. DSMF ¶¶ 64, 65; PRDSMF ¶¶ 64, 65. He searched the restaurant, hollered in the bathroom, and began going up to patrons, patting them on the shoulder, and asking them whether they had seen his girlfriend. DSMF ¶¶ 66, 67; PRDSMF ¶¶ 66, 67.

## 2. Deputy Lepper Intervenes

As Mr. Eaton searched the restaurant for Ms. Furrow, Jason Lepper, a deputy with the Hancock County Sheriff's Department, was off-duty with his family at China Hill. DSMF ¶ 68, PRDSMF ¶ 68. Mr. Eaton went in and out of the restaurant a few times. DSMF ¶ 74; PRDSMF ¶ 74. While Deputy Lepper was in the lobby, he saw Mr. Eaton bump into the restaurant doors as he tried to re-enter, stumble back, pull the doors open, and walk inside. DSMF ¶ 76; PRDSMF ¶ 76. As

---

[6] In his response to Defendants' Statement of Material Fact paragraph 61, Mr. Eaton moves to strike, stating that the statement should be stricken "because the statement does not address any testimony found in the Eaton Deposition at Page 11, as cited." PRDSMF ¶ 61. As the Magistrate Judge pointed out, the County Defendants erred in citing the Eaton Deposition. Ms. Furrow herself confirmed the statements on page 11 of her transcript. *Rec. Dec.* at 2 n.1. The Court DENIES Mr. Eaton's motion to strike.

Mr. Eaton entered, Deputy Lepper observed Mr. Eaton stumble, appear unsteady, and he could smell alcohol as Mr. Eaton walked by. DSMF ¶ 78; PRDSMF ¶ 78. A few minutes later, Mr. Eaton came back into the lobby and loudly swore, "This is fucking bullshit." DSMF ¶ 79; PRDSMF ¶ 79. Deputy Lepper, along with a number of other patrons, concluded that Mr. Eaton was intoxicated, and they became concerned that Mr. Eaton might attempt to drive. DSMF ¶ 80, 81, 84, 85; PRDSMF ¶ 80, 81, 84, 85.

Deputy Lepper directed his brother-in-law, Joshua Stevens, and his wife to call the Sheriff's Office or the Police Department to inform them that an intoxicated patron at China Hill might attempt to drive. DSMF ¶ 86; PRDSMF ¶ 86. Mr. Stevens called the Sheriff's Department. DSMF ¶ 87; PRDSMF ¶ 87. As Mr. Eaton walked back into the parking lot, Deputy Lepper tailed him by fifteen or twenty feet. DSMF ¶ 88; PRDSMF ¶ 88. The reason Deputy Lepper followed Mr. Eaton was because he thought he was drunk and might attempt to drive. PSAMF ¶ 1; DRPSAMF ¶ 1. While in the parking lot, Mr. Eaton stumbled around, mumbled, and talked to himself. DSMF ¶ 90; PRDSMF ¶ 90. Deputy Lepper overheard him saying something about his car and his woman. DSMF ¶ 91; PRDSMF ¶ 91.

### 3. The China Hill Parking Lot Encounter

At this point, their recollections diverge.[7] As Mr. Eaton is the non-moving party, the Court relates his version. Mr. Eaton says that he went from the parking lot to

---

[7] As the Magistrate Judge observed, the County Defendants unnecessarily made the Court's job more difficult by failing to directly respond to Mr. Eaton's Statement of Additional Material Facts. After the Defendants filed their Statement of Material Facts, Mr. Eaton responded to the County Defendants' facts and posited additional facts. The County Defendants noticed that some of his

the side entrance of the restaurant to re-enter and avoid Deputy Lepper. PSAMF ¶¶ 4, 5. The side door would not open. DSMF ¶ 96; PRDSMF ¶ 96. Deputy Lepper yelled at Mr. Eaton to stop, identified himself as a police officer, and ordered Mr. Eaton to the ground DSMF ¶ 98, 99; PRDSMF ¶ 98, 99. When Deputy Lepper ordered Mr. Eaton to the ground, he did not show Mr. Eaton a badge or tell him that he was under arrest. PASMF ¶¶ 15, 17. Mr. Eaton refused to comply and turned toward Deputy Lepper in a fighting stance. DSMF ¶ 100; PRDSMF ¶ 100.

During oral argument, a factual question arose as to whether Mr. Eaton was carrying bags with leftovers when he turned and assumed a belligerent stance toward Deputy Lepper. Mr. Eaton's counsel asserted that the summary judgment

---

additional statements were identical to statements that Mr. Eaton had posited in his own motion for summary judgment. Instead of responding to the additional statements, the County Defendants incorporated by reference their earlier responses to the facts Mr. Eaton had proffered in his separately-filed Motion for Summary Judgment. In their earlier responses, however, the County Defendants had only posited a response. Thus, to determine how the County Defendants responded to Mr. Eaton's Statement of Additional Material Facts in this motion, the Court was required to pull out Mr. Eaton's Statement of Material Facts in another motion, pull out the County Defendants' Response to Mr. Eaton's Statement of Material Facts in the other motion, compare the two documents, and then compare those documents to the Plaintiff's Statement of Additional Material Facts in this motion. It would have made the Court's work much more efficient if the County Defendants had complied with the Local Rule and directly responded to the Plaintiff's Statement of Additional Material Facts.

The County Defendants went further and moved to strike each of the Plaintiff's additional facts "because they are, without a single exception, repeated verbatim from Plaintiff's original Statement of Material Facts (*Document No. 89*)." *Defs.' Hancock Cnty., Hancock Cnty Sheriff's Dep't, William Clark, Jason Lepper, Ryan Haines, Heather Sullivan, Joshua Gunn, Crystal Hobbs, Carl Dannenberg, Robert Morang, and John Weaver's Reply Statement of Material Facts (Local Rule 56(d))* at 11-12 (Docket # 128) (DRPSMF). To the extent the County Defendants' objection survives the Magistrate Judge's ruling, the Court DENIES the County Defendants' motion to strike. Mr. Eaton's motion for summary judgment was a separate, dispositive motion and proceeded on a separate track. In fact, the Magistrate Judge addressed Mr. Eaton's motion separately, issued a Recommended Decision on March 17, 2010, *Recommended Dec.* (Docket # 134), and on April 6, 2010, this Court affirmed the Recommended Decision without objection. *Order Affirming the Recommended Dec. of the Magistrate Judge* (Docket # 137). All of this took place before the Magistrate Judge issued a Recommended Decision on the Defendants' Motion for Summary Judgment. What was improper was for the County Defendants to fail to respond to the Plaintiff's Statement of Additional Material Fact and instead to refer the Court to their responses to another Statement of Material Fact in another motion.

record confirms that he was holding carryout bags of food when he turned to face Deputy Lepper—a fact that would make his belligerence less intimidating. In support, Mr. Eaton's counsel pointed to the following Delphic statement of material fact:

> Defendant Jason Lepper admits the bags are held with your fists and Plaintiff Ronald Eaton was holding the bags.

PSAMF ¶ 48. This statement of material fact appears wholly without context. There is no other mention of bags in Mr. Eaton's additional statement and no mention of carryout bags of Chinese food. Upon first review, the Court did not know what to make of the statement. The Court accepts Mr. Eaton's counsel's contention that there is evidence in this summary judgment record that as he turned to face Deputy Lepper, Mr. Eaton was carrying bags of leftover food.

Deputy Lepper approached Mr. Eaton, grabbed him, and pushed him up against the exterior wall. DSMF ¶ 104; PRDSMF ¶ 104. Mr. Eaton was able to grab onto the door handle and, as Mr. Eaton held onto the handle, Deputy Lepper put Mr. Eaton's right wrist into a wrist lock. PSAMF ¶ 7. While Mr. Eaton was holding onto the door handle, James Lepper, Deputy Lepper's father, pried Mr. Eaton's fingers off the handle. DSMF ¶ 109; PRDSMF ¶ 109. Deputy Lepper and, to a lesser extent, Mr. Stevens had a difficult time wrestling him to the ground. PSAMF ¶ 10. Mr. Eaton was yelling, swearing, and belligerent. DSMF ¶ 103; PRDSMF ¶ 103.

When exactly Deputy Lepper applied enough force to Mr. Eaton's arm to damage his shoulder is very much in dispute. Both parties agree that Deputy Lepper placed

one of Mr. Eaton's arms in a wrist lock or arm bar and pulled his arm behind his back for pain compliance. DSMF ¶ 105; PRDSMF ¶ 105; PSAMF ¶ 11. They also agree that Deputy Lepper held Mr. Eaton's arm halfway up his back and threatened to break it when it was near the back of his neck. PSAMF ¶¶ 8, 11, 12. They do not agree, however, precisely when Deputy Lepper applied so much pressure on Mr. Eaton's arm that he injured Mr. Eaton's shoulder.

At oral argument, the Court questioned counsel closely and Plaintiff's counsel referred to the following statement of material fact:

> Frank Stanley stated that Jason Lepper had Ronald Eaton's hand and arm on the middle of his back, halfway up, and then made a threat to break Ronald's arm and pushed it up higher "near to the back of his neck."

PASMF ¶ 12. Mr. Eaton's counsel insisted that the evidence revealed that Deputy Lepper injured Mr. Eaton's shoulder after he had taken Mr. Eaton to the ground and while he was lying there; in other words, after he had been subdued. Defense counsel vigorously objected, asserting that there was no evidence in the record that Mr. Eaton was on the ground when the Deputy broke his shoulder.

The Court required Plaintiff's counsel to file record references to support this version of the events, which, on its face, did not seem justified by the summary judgment record. On September 17, 2010, Mr. Eaton's counsel filed a series of record references, including Mr. Eaton's testimony, which read in part:

> So he [Deputy Lepper] is grabbing my right arm and I'm going, get out of here, and what are your doing, leave me alone, what have I done; and then the other two intervene and the other one is grabbing my other arm and then they're twisting and then they're slamming me onto the ground and then I got a guy that is not even a police officer, no rights read, no nothing. I got a guy that's on top of my neck 220

something pounds, I got a guy on this arm, another guy on this arm, and they're rimracking me. What I mean by rimracking is they've got this arm way up behind my back, this one up behind my neck, ripping things rights completely out, on the ground.

*Pl.'s Supp. Oral Argument as Ordered by the Court*, Attach. 4, *Dep. of Ronald Eaton* 36:3-16 (Docket # 150). Based upon this additional record reference, for purposes of summary judgment analysis, the Court accepts that Mr. Eaton's injury was sustained *after* Mr. Eaton had been wrestled to the ground.

When Deputy Robert Morang of the Hancock County Sheriff's Department arrived, Mr. Eaton was face down on the ground with his hands behind his back. DSMF ¶ 112, PRDSMF ¶ 112. Deputy Morang handcuffed Mr. Eaton and Officer Shawn Willey placed him in an Ellsworth police cruiser and transported him to Hancock County Jail. DSMF ¶ 114; PRDSMF ¶ 114. When Mr. Eaton asked why he was being arrested, Deputy Lepper responded, "because you're being a drunk asshole." PASMF ¶ 19.

### 4. Robert Eaton and His Night in Jail

Prior to Mr. Eaton's arrival, the jail was alerted that it should be ready for someone who was belligerent, combative, and argumentative; the jail was not told he was injured. DSMF ¶¶ 119, 120; PRDSMF ¶¶ 119, 120. Mr. Eaton arrived at the jail at about 6:18 p.m. DSMF ¶ 121; PRDSMF ¶ 121. Corrections Officers Ryan Haines and Joshua Gunn met Mr. Eaton at the jail's sally port. DSMF ¶ 122; PRDSMF ¶ 122. Mr. Eaton was slow getting out of the police cruiser. DSMF ¶ 127; PRDSMF ¶ 127. He was unstable, slurred his speech, smelled like alcohol, and appeared intoxicated. DSMF ¶¶ 130, 131; PRDSMF ¶¶ 130, 131. He was pat-

searched and brought into the jail for booking. DSMF ¶¶ 138, 139; PRDSMF ¶¶ 138, 139.

Deputy Lepper told Officer Willey to charge Mr. Eaton with disorderly conduct and criminal threatening. DSMF ¶ 116; PRDSMF ¶ 116; PASMF ¶ 21. After Officer Willey filled out the summons at the jail, he wrote "unable to sign" on them and did not have Mr. Eaton sign them because Mr. Eaton was agitated. *Defs.' SMF* at ¶¶ 117, 118; *Pl.'s RDSMF* at ¶¶ 117, 118. Mr. Eaton was not very cooperative during fingerprinting and was treated roughly. DSMF ¶ 140; PRDSMF ¶ 140. At the jail, Deputy Willey completed a Prisoner Safekeeping Record and recommended that Mr. Eaton remain in custody until he became sober. DSMF ¶¶ 132, 133; PRDSMF ¶¶ 132, 133. Because he was very intoxicated and because of his conduct, Mr. Eaton was placed in an 8 hour hold. DSMF ¶ 148; PRDSMF ¶ 148. Correction Officers Haines and Gunn took Mr. Eaton into the nurse's station to be changed into a suicide smock. DSMF ¶ 149; PRDSMF ¶ 149. When he was at the nurse's station, Mr. Eaton was uncooperative and probably yelling. DSMF ¶¶ 152, 154; PRDSMF ¶¶ 152, 154. Corrections Officers Gunn and Haines took Mr. Eaton to the ground. DSMF ¶ 162; PRDSMF ¶ 162.

At some point, Mr. Eaton was strip-searched and as he was strip-searched, he was maced.[8] PASMF ¶ 44. After he was maced, he could not see and therefore does

---

[8] For summary judgment purposes, the Court's description of what happened is choppy because Mr. Eaton denied much, but not all of what the Defendants said happened, but did not supply a separate chronological narrative. *Pls.' Opp'n* at 1 (stating that "the undisputed material facts are set forth in Plaintiff's State[ment] of Material Facts and Plaintiff's Statement of Additional Material Facts. Plaintiff incorporates both into this memorandum of law"). For example, the Defendants say that after he refused to answer questions about whether he was suicidal, he was brought to the nurse's station to be put in a suicide smock. There, he refused to take his clothes off to get into the smock,

not know who did what to him. DSMF ¶ 166; PRDSMF ¶ 166. He lost all recollection after he was sprayed the first time, except he does recall that his clothes were taken off. DSMF ¶ 167; PRDSMF ¶ 167. The next thing Mr. Eaton remembers is waking up in cell HD1. DSMF ¶ 173; PRDSMF ¶ 173. He had been taken there to be placed on intoxication segregation with 15 minute observations. DSMF ¶¶ 170, 171; PRDSMF ¶¶ 170, 171.

He recalls being transferred by a corrections officer to HD2, a different cell. DSMF ¶ 175; PRDSMF ¶ 175. After an unknown amount of time, Mr. Eaton began to feel pain flickering in his arms. DSMF ¶ 176; PRDSMF ¶ 176. Mr. Eaton began banging on the cell door and yelling to get the corrections officers' attention. DSMF ¶ 177; PRDSMF ¶ 177. He was angry that he was there and he kicked the door. DSMF ¶ 178; PRDSMF ¶ 178. Mr. Eaton says he asked for aspirin but was refused, and he banged some more and asked to see a doctor. DSMF ¶¶ 183, 184; PRDSMF ¶¶ 183, 184. Mr. Eaton kept saying that his shoulder hurt and he was told to leave it down and stop using his arm. PRDSMF ¶ 185. Mr. Eaton was told that a Physician's Assistant would be called and Corrections Officer Haines contacted Physician's Assistant Al Blackadar. DSMF ¶¶ 186, 187; PRDSMF ¶¶ 186, 187. Physician's Assistant Blackadar told Corrections Officer Haines to continue to observe Mr. Eaton. PRDSMF ¶ 188. Mr. Eaton asked twice for medical assistance.

---

flailed about, became aggressive, was warned he would be maced, was maced, was wrestled to the ground, maced again, and finally placed in a suicide smock. DSMF ¶¶ 143-68. Mr. Eaton denies almost all of this, except he asserts he was strip-searched and maced. PRDSMF ¶¶ 143-68. The Court has not accepted as true any facts that Mr. Eaton has denied but this leaves Mr. Eaton somewhere in the jail naked and maced without context. This may well be an accurate reflection of what Mr. Eaton recalls, but as a consequence, the Court's recitation does not flow logically.

DSMF ¶ 190; PRDSMF ¶ 190. Initially, the corrections officers laughed at him when he requested a doctor, but later they brought a sandwich bag with ice. PASMF ¶ 43.

Mr. Eaton says at that point, three corrections officers and a man in a camouflage suit came into his cell, maced him, and beat him. DSMF ¶ 191; PRDSMF ¶ 191. Mr. Eaton does not know who these men were, but he thinks they were Corrections Officers Weaver, Gunn, and Haines. DSMF ¶ 192; PRDSMF ¶ 192; PSAMF ¶ 39. Mr. Eaton recalls that, before they maced and kicked him, one of the men said: "You deserve this." PSAMF ¶ 39. They uncuffed him and left him alone in the cell for about an hour and a half. DSMF ¶¶ 194, 195; PRDSMF ¶¶ 194, 195. He was then allowed to change into his own clothes and make a phone call; he met with the bail commissioner and bailed himself out. DSMF ¶ 195; PRDSMF ¶ 195. He left jail about 4 a.m. on November 6, 2006. DSMF ¶ 196; PRDSMF ¶ 196.

### 5. Mr. Eaton's Injuries

Within minutes of Mr. Eaton's release from jail, Mr. Eaton's brother took him to the Maine Coast Memorial Hospital.[9] PSAMF ¶ 46. Dr. Williamson performed surgery on Mr. Eaton's shoulder on December 4, 2006. PSAMF ¶ 47. Dr.

---

[9] As noted in footnote 7, the County Defendants did not respond to Mr. Eaton's Statement of Additional Material Facts and instead referenced their responses to his earlier Statement of Material Facts in support of his Motion for Summary Judgment. DRPSMF ¶ 46 (citing *Cnty. Defs.' Opposing Statement of Material Facts with Req. to Strike and Additional Material Facts* ¶ 439 (Docket # 115) (DOSMF). For this assertion, the County Defendants referred the Court to their response to his Statement of Material Fact paragraph 436. The Court reviewed Mr. Eaton's Statement of Material Fact paragraph 436, *Pl.'s Statement of Material Facts* (Docket # 89), and confirmed that the statements are the same. It then found that although the County Defendants had admitted paragraph 436 of the Plaintiff's Statement of Material Fact, they had done so "for purposes of this motion only." DOSMF ¶ 436. The Court does not accept the County Defendants' limited admission of paragraph 436 and treats the admission as effective for purposes of their motion for summary judgment as well.

Williamson testified that "there was a circumferential, almost a degloving of the entirety of the rotator cuff around the humeral head which is much bigger than your typical rotator cuff injury, and that's when we elected to open the shoulder so we could get a better global view of the shoulder." *Id.* Based on his findings from the surgery and a reasonable medical probability, Dr. Williamson testified that, based on a reasonable medical probability and his surgical findings, Mr. Eaton's injury was not self-inflicted.[10]  PSAMF ¶ 49.

### 6.    The Acquittal

The criminal trial against Mr. Eaton took place on September 19, 2007 in Hancock County Superior Court and Justice William Brodrick granted Mr. Eaton's Motion for Judgment of Acquittal.[11]  PASMF ¶ 22.

### 7.    The Sheriff Department Takes No Action

After the acquittal, Sheriff William Clark told a local newspaper:

---

[10] As noted in footnote 7, the County Defendants did not respond to Mr. Eaton's Statement of Additional Material Facts and instead referenced their responses to his earlier Statement of Material Facts in support of his Motion for Summary Judgment.  DRPSMF ¶ 49 (Citing DOSMF ¶ 978).  For this assertion, the County Defendants referred the Court to their response to his Statement of Material Fact paragraph 978.  The Court reviewed Mr. Eaton's Statement of Material Fact paragraph 978 and confirmed that the statements are the same.  PSMF ¶ 978.  It then found that although the County Defendants had admitted paragraph 978 of the Plaintiff's Statement of Material Fact, they had done so "for purposes of this motion only."  The Court does not accept the County Defendants' limited admission of paragraph 978 and treats the admission as effective for purposes of their motion for summary judgment as well.

[11] As noted in footnote 7, the County Defendants did not respond to Mr. Eaton's Statement of Additional Material Facts and instead referenced their responses to his earlier Statement of Material Facts in support of his Motion for Summary Judgment.  DRPSMF ¶ 22 (citing DOSMF ¶ 93).  For this assertion, the County Defendants referred the Court to their response to his Statement of Material Fact paragraph 93.  The Court reviewed Mr. Eaton's Statement of Material Fact paragraph 93 and confirmed that the statements are the same.  It then found that although the County Defendants had admitted paragraph 93 of the Plaintiff's Statement of Material Fact, they had moved to strike paragraph 93 "because it is not material in that it does not have the ability to affect or change the outcome of the case."  DOSMF ¶ 93.  In support, the County Defendants cite *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2004), for the familiar definition of "material."  The Court DENIES the County Defendants' motion to strike.

> I stand by my deputy. Listen, I don't care what those people thought. I have complete confidence in Jason Lepper's decision and what Jason Lepper thought he saw, he thought required law enforcement attendance, and I will always believe that Jason acted as a police officer in trying to quell some kind of criminal action. I don't care what those other people thought they saw. It's what Jason thought he was seeing and the action he thought was necessary and I support that.

PASMF ¶ 28. Sheriff Clark later testified that he did not care what the judge said.

PASMF ¶ 30. Sheriff Clark confirmed that there was no separate investigation of Jason Lepper and this incident. PASMF ¶ 33. Captain Carl Dannenberg did not review Mr. Eaton's files, PASMF ¶ 34, and Deputy Lepper never received any counseling, training, or disciplinary or other action by the Sheriff's Department regarding his dealings with Ronald Eaton, PASMF ¶ 24.[12]

## II. DISCUSSION

### A. Legal Standard

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact. . . ." Fed. R. Civ. P. 56(c)(2). A fact is material if its resolution "might affect the outcome of the suit under the governing law," and the issue is genuine "if the evidence is such that

---

[12] As noted in footnote 7, the County Defendants did not respond to Mr. Eaton's Statement of Additional Material Facts and instead referenced their responses to his earlier Statement of Material Facts in support of his Motion for Summary Judgment. DRPSMF ¶¶ 24, 34 (citing DOSMF ¶¶ 148, 728). For these assertions, the County Defendants referred the Court to their responses to his Statement of Material Fact paragraphs 148 and 728. The Court reviewed Mr. Eaton's Statement of Material Fact paragraphs 148 and 728 and confirmed that the statements are the same. It then found that although the County Defendants had admitted paragraph 148 of the Plaintiff's Statement of Material Fact, they had moved to strike paragraph 148 "because it is not material in that it does not have the ability to affect or change the outcome of the case." DOSMF ¶ 148. In support, the County Defendants cite *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2004) for the familiar definition of "material." The Court DENIES the County Defendants' motion to strike paragraph 148. The County Defendants admitted paragraph 728.

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001). When reviewing the record for a genuine issue of material fact, the Court must "read the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." *Merchs. Ins. Co. of N.H., Inc. v. U.S. Fid. & Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998). "To defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993). However, the nonmoving party cannot meet its burden with "conclusory allegations, improbable inferences, and unsupported speculation." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)).

## B. Deputy Lepper's Local Rule 56 Objections

The proposition undergirding much of Deputy Lepper's objection is that the Magistrate Judge improperly credited two of Mr. Eaton's factual denials:

> The crux of the argument is that the recommended decision explicitly acknowledged that Plaintiff failed to properly controvert two central facts, yet credited his unsupported denial of those facts in the legal analysis.

*Def.'s Obj.* at 2. This, Deputy Lepper claims, violates Local Rule 56. *Id.* Further, he says that with the addition of these two "essential facts," Deputy Lepper would be entitled to qualified immunity and his motion for summary judgment should

have been granted. *Id.* The facts are: 1) that Mr. Eaton came up to Deputy Lepper in the China Hill parking lot, grabbed him by his coat, and said "where's my fucking car;" and, 2) that Mr. Eaton tried to take a swing at Josh Stevens, Deputy Lepper's brother-in-law.[13] *Id.* at 4 (citing DSMF ¶¶ 92, 93). In his responses, Mr. Eaton denied both statements and the Magistrate credited his denials. PRDSMF ¶¶ 92, 93; *Rec. Dec.* at 18.

Local Rule 56 provides, in part, that a "party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts . . . and shall support each denial or qualification by a record citation . . . ." D. Me. Loc. R. 56(c). "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f).

1. **Paragraph 92: Mr. Eaton's Interaction with Deputy Lepper in the China Hill Parking Lot**

Turning to Mr. Eaton's denial of paragraph 92—his alleged interaction with Deputy Lepper in the China Hill parking lot—Mr. Eaton cited a portion of his deposition which reads:

Q. And you had no sooner opened the smoking door and you were fixing to go back inside and Jason Lepper grabbed you and the other two then jumped on you, is that true?

A. Yes.

Q. All right. So there were no words between you before they jumped on you?

---

[13] Deputy Lepper allows that Mr. Eaton "place[d] in controversy the allegation that Eaton stated 'where's my fucking car,'" *Def.'s Obj.* at 5. The dispute reduces to whether Mr. Eaton grabbed Deputy Lepper's jacket and whether Mr. Eaton attempted to punch Mr. Stevens.

A. No, it was like I was being robbed or set up.

PRDSMF ¶ 92 (citing *Eaton Dep.* 38:13-20 (Docket # 61)). Defendants object to the Magistrate Judge crediting this citation, because "[t]he evidence offered by the Plaintiff speaks to his version of events that took place at a discrete point in time [and] . . . does not address in any fashion events that occurred at an *earlier* point in time." *Def.'s Obj.* at 5 (emphasis in original). The Defendants contend that Mr. Eaton's assertion that he was "jumped on" as if he "was being robbed or set up," does not specifically refute the Defendants' assertion that Mr. Eaton grabbed the jacket; Mr. Eaton could have previously engaged Deputy Lepper and later been "jumped" by him.[14]

The Court disagrees. Reading the record in the light most favorable to Mr. Eaton and drawing all reasonable inferences in its favor, Mr. Eaton is denying that he came up to Deputy Lepper in the China Hill parking lot, grabbed him by the coat, and swore about his car. He says that the first interaction with Deputy Lepper occurred as he was attempting to re-enter China Hill by the side door. If Mr. Eaton does not believe that any previous interaction took place between Deputy Lepper and himself, he can only deny the allegation and point to the encounter to

---

[14] Further muddying the waters is Mr. Eaton's contention in his Statement of Material Facts accompanying his Motion for Summary Judgment that "Plaintiff Ronald Eaton grabbed Defendant Jason Lepper's coat." PSMF ¶ 31. This statement facially controverts Mr. Eaton's denial in his Reply to Defendants Statement of Material Facts. PRDSMF ¶ 92. Seizing upon this apparent contradiction, the County Defendants claim that Mr. Eaton's assertion in his Statement of Material Facts contradicts his denial in his Response to their Statement of Material Facts. *Def.'s Obj.* at 6. The Court disagrees. The brief answer is that in moving for summary judgment, Mr. Eaton was required to assume the truth of the County Defendants' version of the events; in responding to their motion for summary judgment, he was not. In support of this Statement of Material Fact, Mr. Eaton cited Deputy Lepper's testimony at the motion to suppress. PSMF ¶ 31. It is otherwise obvious that Mr. Eaton does not agree with Deputy Lepper's description of the encounter in the China Hill parking lot.

which he does admit. Although Mr. Eaton elsewhere says that he went to the side door in part to avoid Deputy Lepper, it is not altogether surprising that he would seek to avoid someone who had tailed him into the parking lot. Mr. Eaton's admitted avoidance of Deputy Lepper does not require that he also admit to an earlier encounter with the Deputy. The Court concludes that Mr. Eaton's response did not violate Local Rule 56, and credits his denial of the County Defendants' Statement of Material Fact, paragraph 92.[15]

## 2.    Paragraph 93: Mr. Eaton Swings At Joshua Stevens

As to the Defendants' objection that the Magistrate Judge should not have credited Mr. Eaton's denial that he had "tried to take a swing at Josh Stevens," the Court agrees with the Magistrate Judge that an issue of fact remains. DSMF ¶ 93; PRDSMF ¶ 93. Again, the Defendants' objection is premised on their contention that the record citations fail to address whether "there were events that transpired before the physical interaction referred to by Plaintiff" and so "does not place in controversy the fact that Eaton tried to punch Stevens." *Def.'s Obj.* at 6.

---

[15] In her Recommended Decision, the Magistrate Judge was troubled by apparent contradictions in Mr. Eaton's side of the story. *Rec. Dec.* at 4 n.3. It is true that Mr. Eaton's chronology is spotty and difficult to follow. He says that he tried to enter by the side door in part to avoid Deputy Lepper, which suggests he had some prior interchange with the deputy. But he denies the specific interaction with Deputy Lepper in the parking lot, and implies that his first encounter with Deputy Lepper took place at the side door. He admits that as he attempted to enter the side door, he found he could not open it and at that point, Deputy Lepper came up, identified himself as a police officer, and told him to get on the ground. He says he turned in a fighting stance, moved toward Deputy Lepper, and acted belligerently. Later, he says that he held onto the door handle and that James Lepper, Deputy Lepper's father, pried his fingers off the door handle. Mr. Eaton's recollection of the events may well be foggy because by then he had drunk two beers and the volcano bowl. But a jury could find his version confusing but still credible. He may have initially pulled on the side door handle, turned belligerently toward Deputy Lepper, saw that three men were heading toward him, and grabbed back onto the door handle in defense. Thus, even as to his contention that he was trying to re-enter China Hill to avoid Deputy Lepper, his version could hang together. As to the basic contention that he did not grab Deputy Lepper's clothes in the parking lot, the Court credits his denial for purposes of the County Defendants' Motion for Summary Judgment.

As with the dispute regarding Deputy Lepper's coat, the Plaintiff's denial rests on ambiguous deposition testimony:

> Q. Okay. So it sounds like when you say you got jumped by Lepper and his father and Stevens at the restaurant this of happened really quickly out of the blue; you didn't see it coming, is that true?
>
> A. Right.

PRDSMF ¶ 93 (citing *Eaton Dep.,* at 50:21-51:1). Although the Defendants argue that the record citation does not exclude the possibility that Mr. Eaton previously attempted to punch Mr. Stevens, the Court disagrees. If moments before he was set upon by Deputy Lepper, his father and brother-in-law, Mr. Eaton had tried to punch Mr. Stevens, the altercation at the side door could hardly have come "out of the blue." The Court accepts Mr. Eaton's denial of the County Defendants' Statement of Material Fact, paragraph 93.

## C. Deputy Lepper's Objection to the Recommended Decision's Denial of Summary Judgment on the Unreasonable Arrest Claim

The Defendants object to the Magistrate Judge's recommendation that the Court deny Deputy Lepper's motion for summary judgment on Mr. Eaton's unreasonable arrest claim. *Def.'s Obj.* at 7-9. The County Defendants first argue that "[o]nce the record is credited with the fact that Eaton grabbed Lepper's coat and took a swing at Josh Stevens," the Court must find probable cause for Mr. Eaton's arrest. *Def.'s Obj.* at 7. As the Court accepted Mr. Eaton's denial of the parking lot confrontation with Deputy Lepper and Mr. Stevens, this argument fails. *See supra* Parts II.B.1-2.

The Court next considers whether the arrest was justified even accepting Mr. Eaton's version of events. The analysis on this point turns on whether, at the time Deputy Lepper first attempted to seize Mr. Eaton, there was probable cause such that "the facts and circumstances within [Deputy Lepper's] knowledge and of which [he] had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief" that a crime was being committed.[16] *Caroll v. United States*, 267 U.S. 132, 162 (1925); *accord. Alexis v. McDonald's Rest. of Mass. Inc.*, 67 F.3d 341, 349 (1st Cir. 1995). The Magistrate Judge, crediting Mr. Eaton's version of events, found a genuine issue of material fact as to whether probable cause existed. *Rec. Dec.* at 16-19. The Court agrees.

Excluding the parking lot encounter, under Mr. Eaton's version, it is difficult to understand what crime Mr. Eaton had committed by the time he attempted to re-enter the restaurant. Although later charged with criminal threatening and

---

[16] At oral argument, Deputy Lepper's counsel asserted for the first time that Deputy Lepper's stop of Mr. Eaton was a *Terry v. Ohio*, 392 U.S. 1 (1968) investigative stop, which then became an arrest once Mr. Eaton resisted. The Court is not sure. Once the parking lot encounter is excluded, Mr. Eaton had not committed a crime when Deputy Lepper approached him. It is less clear to the Court than to defense counsel that the surrounding circumstances justified a *Terry* stop on the ground that "criminal activity may be afoot", *id.* at 30, because Mr. Eaton was intoxicated and was attempting to re-enter the restaurant. At oral argument, Deputy Lepper's counsel proposed that, in reentering the restaurant, Mr. Eaton was likely to commit the crime of disorderly conduct. The then existing state of Maine statute against disorderly conduct, 17-A M.R.S. § 501 (repealed May 18, 2007), distinguished public and private places and distinguished loud noises from accosting and taunting that would be likely to cause a violent response by an ordinary person so accosted or taunted. For loud noises, the law required a prior warning by a law enforcement officer and there is no evidence Deputy Lepper had given Mr. Eaton such a warning. For accosting and taunting, the Court remains to be convinced that the evidence in this record would have led a reasonable officer to believe that if Mr. Eaton reentered the restaurant, he was going to engage in disorderly conduct within the meaning of the Maine statute. The analysis is highly contextual and fact-specific, and Deputy Lepper has simply not adduced facts sufficient to allow the Court to make such a determination. In any event, whether Deputy Lepper was justified in making a *Terry* stop is a complicated matter, raised first at oral argument. The Court does not reach it in deciding this motion. *See Borden v. Sec'y of Health and Human Serv.*, 836 F.2d 4, 6 (1st Cir. 2002) (stating that the "[p]arties must take before the magistrate, not only their 'best shot' but all of their shots") (internal quotation marks and citation omitted).

disorderly conduct, there is scant evidence that, as he approached the side door, he had committed or was about to commit either crime. *See Rec. Dec.* at 17-18.

The County Defendants strenuously maintain that even accepting Mr. Eaton's version of the events, probable cause existed "once Lepper announced that he was a police officer, ordered Eaton to the ground, and Eaton responded by displaying aggressive body language and advancing on Lepper." *Def.'s Obj.* at 8 (citing *Sheehy*, 191 F.3d at 23 (stating that an officer had probable cause to arrest for disorderly conduct once she was approached "in a very threatening manner")).[17] The Court disagrees for the same reasons the Magistrate Judge carefully articulated. The Magistrate Judge correctly observed that Mr. Eaton's aggression towards Deputy Lepper "does not rule out an inference that he assumed a defensive and non-threatening posture. Had [Mr.] Eaton assumed a fighting stance against a uniformed officer, this would be a different case." *Rec. Dec.* at 18 (citing *Sheehy v. Town of Plymouth*, 191 F.3d 15, 23 (1st Cir. 1999), for the proposition that advancing on a uniformed officer and displaying aggressive body language would support a probable cause finding for disorderly conduct). On the facts, Mr. Eaton was intoxicated and excitable, but whether, in approaching Deputy Eaton while carrying bags of take-out food, he was truly threatening, raises a genuine issue of material fact.[18]

---

[17] Deputy Lepper's citation of *Sheehy* is curious because the First Circuit concluded that since there were different versions as to what took place between the officer and the plaintiff, "Officer Quinn should not have been granted summary judgment." *Sheehy*, 191 F.3d at 23.

[18] The Court adds only that Deputy Lepper seems to assume that the very instant he told Mr. Eaton that he was a police officer and to get on the ground, Mr. Eaton was required to believe and obey him. The Court is not convinced that without showing any official identification a police officer is entitled to command a person who has committed no crime to the ground, to manhandle him when

Deputy Lepper's argument that he had probable cause once Mr. Eaton took an aggressive step toward him is unpersuasive because it assumes what Deputy Lepper must first prove: that he had probable cause *initially*, which then justified his announcement and command to Mr. Eaton to get on the ground. As stated *supra*, probable cause remains a factual dispute. Deputy Lepper's later justification for arresting Mr. Eaton must then also be a matter of fact for the jury. Accordingly, the Court affirms the Magistrate Judges recommendation to deny summary judgment to Deputy Lepper on Mr. Eaton's claim of unreasonable arrest.

### D. Deputy Lepper's Objection to the Magistrate Judge's Denial of Summary Judgment on Mr. Eaton's Excessive Force Claim

Deputy Lepper criticizes the Magistrate Judge's opinion by saying that she dismissed his motion for summary judgment on the excessive force claim "with a mere wave of the hand." *Def.'s Obj.* at 10. He claims she erred by failing to discuss Deputy Lepper's qualified immunity and by treating the probable cause issue as determinative of the force issue. *Id.* at 11.

An excessive force claim under the Fourth Amendment requires a showing that "the defendant employed force that was unreasonable under all the circumstances." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009). "The 'reasonableness' inquiry in an excessive force case is an objective one: whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Reasonableness must be "judged from

---

he fails to obey orders, and to assert that if the person resists at all, he is resisting arrest. The situation is entirely different if the officer is in uniform or if the officer shows the person his badge.

the real-time perspective of the officer on the scene, rather than the 20/20 vision of hindsight." *Id.* at 396. Its measurement requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; Morelli*, 552 F.3d at 23. While engaging in this inquiry, however, the Court must be mindful that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-7. The Magistrate Judge concluded that "[a]ccepting Eaton's version of events as true, forcing him to the ground would appear an unwarranted act, let alone applying pain compliance severe enough to dislocate his shoulder." *Rec. Dec.* at 19.

The Court rejects the Defendants' characterization of the Magistrate Judge's analysis and disagrees with the Defendants' conclusion. Application of the *Graham v. Connor* reasonableness factors to Mr. Eaton's version of the events could lead a reasonable jury to conclude that Deputy Lepper used excessive force.

Turning to the *Graham* analysis, the first two factors—the severity of the crime and the risk to the public—weigh strongly in Mr. Eaton's favor. Again accepting Mr. Eaton's version of the events, he had committed no crime when he was accosted by strangers. Second, although there may have been some risk to the public because Mr. Eaton was intoxicated and upset, *see supra* n.16, Mr. Eaton at

least to that point, had hurt no one. The problem with the third factor—resisting arrest—is that, accepting Mr. Eaton's version of the events as correct, Deputy Lepper forced his arm to the back of his neck and injured his shoulder, while Mr. Eaton was lying on the ground. Thus, at the point the injury occurred, Mr. Eaton was not resisting arrest. Moreover, a jury could reasonably find that Mr. Eaton's prior resistance—consisting of a belligerent advance (with bags of takeout food in hand), a hasty retreat, and then hanging on a door handle—did not justify the force necessary to torque Mr. Eaton's wrist behind his neck or to nearly completely deglove Mr. Eaton's rotator cuff. Applying the *Graham* factors, Mr. Eaton has raised factual issues for jury resolution.

### E.   Deputy Lepper's Objection to the Magistrate Judge's Denial of Summary Judgment on His Assertion of Qualified Immunity

Deputy Lepper seeks legal shelter under the umbrella of qualified immunity, and objects to the Magistrate Judge's recommendation that the Court deny his motion for summary judgment on qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).) Protection is granted even where the officials "mistakenly believe that they are acting in accordance with constitutional mandates," provided the official's belief was reasonable. *Medeiros v. Town of Dracut*, 21 F. Supp. 2d 82, 85-86 (D. Mass. 1998) (citing *Hunter v. Bryant*, 502 U.S. 244, 227 (1991)). Its underlying

purpose is to guard against "fear of personal monetary liability and harassing litigation . . . unduly inhibit[ing] officials in the discharge of their duties." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

In ruling on a motion for summary judgment involving a qualified immunity defense, the Court's analysis is torn in two directions: for the purposes of summary judgment analysis, giving "absolute deference to the nonmovant's factual assertions," and for the purposes of qualified immunity analysis, giving "deference to the reasonable, if mistaken, actions of the movant." *Morelli*, 552 F.3d at 18-19. The First Circuit, appreciating the challenges of this bipolar analysis, directed that courts "cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Id.* at 19.

Consistent with the First Circuit's directive, this Court gives Mr. Eaton the benefit of any reasonable factual inferences in his favor, and applies those facts to the three-factor test[19] this circuit employs in considering an assertion of qualified immunity: "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue."

---

[19] The Supreme Court generally consolidates the second and third factors into a single factor assessing "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 129 S. Ct. at 815-16 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

*Mihos v. Swift*, 358 F.3d 91, 102 (1st Cir. 2004); *Collins v. Knox Cnty*, 569 F. Supp. 2d 269, 278-79 (D. Me. 2008).

### 1.     Qualified Immunity as to Unreasonable Seizure

The Magistrate Judge determined that Deputy Lepper is not entitled to qualified immunity on the unreasonable seizure claim because

> [i]t was clearly established long before 2006 that probable cause was needed to support Eaton's warrantless arrest and, accepting for present purposes that there was no threatening conduct, Deputy Lepper would have been on fair notice that arresting Eaton would offend the Fourth Amendment.

*Rec. Dec.* at 18.  In the Court's view, the Magistrate Judge was correct.

The Court has affirmed the Magistrate Judge's decision that Deputy Lepper is not entitled to summary judgment on the issue of unreasonable seizure.  *See supra* section II.C; *Graham*, 490 U.S. at 396 (listing as factors "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight").  A reasonable jury could find that Deputy Lepper's attempted arrest of Mr. Eaton constituted an unreasonable seizure under the Fourth Amendment.  The Court therefore concludes that Mr. Eaton has satisfied the first factor of the qualified immunity test.

The second factor similarly points in Mr. Eaton's favor.  There is a clearly established and long-held right to be free from arrest without probable cause.  *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) ("Whether [the warrantless] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was

made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."); *Vargas-Badillo v. Diaz-Torrers*, 114 F.3d 3, 6 (1st Cir. 1997) ("[C]learly established Fourth Amendment law required that the defendants have probable cause to support [the] warrantless arrest."); *Prokey v. Watkins,* 942 F.2d 67, 73 (1st 1991) ("Whether . . . a reasonable policeman, on the basis of the information known to him, could have believed there was probable cause is a question of law, subject to resolution by the judge not the jury."); *Hernandez-Lopez v. Pereir*, 380 F. Supp. 2d 30, 35 (D. P.R. 2005) (denying qualified immunity because the "facts alleged in the complaint . . . describe a warrantless arrest without probable cause and the subsequent use of force").

As to the third factor, accepting Mr. Eaton's version, including the lack of probable cause and the manner and extent of his injuries, the Court concludes that a similarly situated, reasonable officer would have understood that, lacking probable cause, wrestling Mr. Eaton to the ground to effect an unjustifiable arrest would violate the Fourth Amendment. Accordingly, Deputy Lepper is not entitled to summary judgment on qualified immunity from Mr. Eaton's Fourth Amendment unreasonable seizure claim.

## 2. Qualified Immunity as to Excessive Force

The Magistrate Judge determined that Deputy Lepper is not entitled to qualified immunity on the excessive force claim. Deputy Lepper objects, arguing that Deputy Lepper is entitled to immunity under any of the three factors.

Having concluded that Deputy Lepper is not entitled to summary judgment on the issue of excessive force, *see supra* section II.D., the Court also concludes that Mr. Eaton has satisfied the first factor of the qualified immunity test. The Court also concludes that Mr. Eaton has satisfied the second factor. The extensive body of case law "supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer." *Morelli*, 552 F.3d at 23-24. Deputy Lepper cannot claim ignorance of this firmly established constitutional precept.

The Court turns to the third factor: whether an officer standing in Deputy Lepper's shoes would have understood that his actions amounted to excessive force proscribed by the Fourth Amendment. The First Circuit has emphasized that an officer's actions are to be given the benefit of the doubt. The standard is that of "the 'reasonable officer' and what 'could reasonably have been thought lawful' by such an officer, terms suggesting a measure of deference." *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) (quoting *Anderson*, 483 U.S. at 638) (internal citation omitted). In close cases, "a jury does not automatically get to second-guess [an officer's] life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently." *Id*. In cases involving claims of excessive force, "defeating a qualified

immunity defense requires a showing of an incremental degree of error—an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim . . . ." *Morelli*, 552 F.3d at 24. Qualified immunity should only be rejected where "the level of force chosen by the officer cannot in any way, shape, or form be justified under those facts". *Id.*

Based on Mr. Eaton's version of the events, this case is controlled by *Jennings v. Jones*, 499 F.3d 2 (1st Cir. 2007). In *Jennings*, the First Circuit addressed a factual situation not unlike the one before the Court here: an officer applied an "ankle turn control technique" in which he twisted the plaintiff's ankle and broke it, after the plaintiff had stopped resisting arrest. *Id.* at 5. Having found that the defendant officer had not satisfied the first two qualified immunity factors, the court turned to the third. The court focused on the officer's *increase* in force *after* the plaintiff had ceased resisting, and found that "It is this increased force that an objectively reasonable officer would not have believed was lawful." *Id.* at 20. On this basis, the officer could not then satisfy the final factor and qualified immunity was denied. *Id.* The *Jennings* Court concluded that on these facts, the district court erred in granting a motion for judgment as a matter of a law. *Id.* at 20-21.

Mr. Eaton has raised a similar factual question as to whether Deputy Lepper applied a pain control technique to Mr. Eaton's arm and severely injured his shoulder after Mr. Eaton had stopped resisting. Mindful of the First Circuit's ruling in *Jennings* and the factual similarities between that case and Mr. Eaton's version of events, the Court concludes that the Magistrate was correct in denying summary

judgment on the issue of qualified immunity to the excessive force claim; the reasonable officer could not think it legal, once Mr. Eaton was on the ground and not resisting, to increase the amount of force and lever Mr. Eaton's arm so far behind his neck that he would suffer a near degloving of his rotator cuff.

### F.    Ronald Eaton's Objection to the Municipal Liability Claim

Mr. Eaton objects to that portion of the Magistrate's Recommended Decision dismissing Hancock County, Hancock County Sheriff's Department, Sheriff Clark and Jail Administrator Dannenberg from the action on the grounds that they cannot be held liable as municipal actors.

#### 1.    Dr. Alvin Cohn's Expert Testimony

Mr. Eaton's objection is primarily premised on evidence from Dr. Alvin Cohn, an expert in *Harriman v. Hancock County*, No. CV-08-122-B-W, 2009 U.S. Dist. LEXIS 72668 (D. Me. Aug. 17, 2009), currently on appeal before the First Circuit and involving similar allegations.  Offering Dr. Cohn's opinion in this case, Mr. Eaton attempts to buttress his contention that the municipal defendants are liable under a failure to train theory.  However, Mr. Eaton never designated Dr. Cohn as an expert in this case, and the fact he did so in another case is irrelevant.  The Court is perplexed that Mr. Eaton would consider asking the Court to evaluate the opinions of an expert witness designated in another case but not this one.  It will not do so.

#### 2.    Analysis of Municipal Liability Claim

The Magistrate Judge recommended that the Court grant summary judgment to Hancock County, the Hancock County Sheriff's Department, Jail

Administrator Dannenberg, and Sheriff Clark on Mr. Eaton's claim of municipal liability under 42 U.S.C. § 1983. Mr. Eaton objects.

Municipal liability under § 1983, when premised on a municipality's failure to train its employees, may be reduced to a two-factor test. *See Young v. City of Providence*, 404 F.3d 4, 25-26 (1st Cir. 2005). First, the alleged harm to the plaintiff must be the result of a constitutional violation. *Id.* at 26. Second, the municipality must be responsible for the violation by virtue of some policy or custom. *Id.* This second, causality consideration requires that 1) the municipal policy or custom have actually caused and been "the moving force" behind the alleged injury, *id.* at 26, 29 (quoting *Canton*, 489 U.S. 378, 391 (1989), that "the identified deficiency in a city's training program must be closely related to the ultimate injury"), and 2) that there have been "deliberate indifference" by the municipality such that it "disregarded a known or obvious risk of serious harm from its failure to develop a training program," *id.* at 26-28. The First Circuit has described the standard for proving deliberate indifference as "exceptionally stringent." *Crete v. City of Lowell*, 418 F.3d 54, 66 (1st Cir. 2005). Proof may come in the form of a pattern of similar violations or, otherwise, by a showing that the constitutional violation was a "plainly obvious consequence" of the failure to train. *Id.*; *Young*, 404 F.3d at 30.

Turning to the first factor, the facts, viewed most favorably towards Mr. Eaton, would allow a reasonable jury to conclude that Mr. Eaton's alleged harm was the product of constitutional violations. Mr. Eaton was sprayed multiple times with OC spray—including at times when he was cooperating with the corrections officers;

his several requests for aspirin were denied; his requests for a doctor prompted the officers' ridicule; Mr. Eaton was not examined by a doctor, and instead was given a small bag of ice; and most severely, Mr. Eaton was beset upon by four men who entered his cell, kicked him, administered OC spray, handcuffed him, and remarked that "You deserve this." Accepting these allegations as true, a reasonable jury could conclude that Mr. Eaton's Fourth and Fourteenth Amendment rights were violated.

As to the second factor, the Magistrate Judge ruled that there is no record evidence that these constitutional harms were the result of a municipal policy or custom. In his objections to the Magistrate Judge's Recommended Decision, Mr. Eaton directs the Court to the ongoing *Harriman* case and an allegation of excessive force made by Joni Banks as proof of a pattern of previous instances of excessive force. Mr. Eaton's reliance on *Harriman* is misplaced. As noted by the Magistrate Judge, the facts in *Harriman* suggested that the plaintiff's injuries occurred after he suffered a seizure and fell in his cell, not as the result of retributive force by the police. The Magistrate Judge therefore concluded, and this Court agrees, that *Harriman* is not relevant to the claim here.[20] As to Mr. Eaton's insistence that the previous claim of Ms. Banks indicates a pattern, the Court is unwilling to credit Mr. Eaton with evidence that is not part of this record. *See Sutliffe*, 584 F.3d at 325 (quoting *Sullivan*, 561 F.3d at 14) (The nonmoving party cannot meet its burden with "conclusory allegations, improbable inferences, and unsupported speculation.").

---

[20] *Harriman* dealt with an individual who suffered a stroke while in custody at the Hancock County Jail and had no memory of his time in detention. The Court agrees with the Magistrate Judge that *Harriman's* factual dissimilarities negate its relevance.

The only facts Mr. Eaton supplies that could conceivably indicate a policy, procedure or custom are that: 1) Jail Administrator Dannenberg is not trained in jail policy and procedure; 2) Administrator Dannenberg did not investigate the incident or discipline the deputies or corrections officers involved in the incident; and, 3) Sheriff Clark indicated his intent to support Deputy Lepper against Mr. Eaton's allegations. The Magistrate Judge considered these facts and concluded that they do not demonstrate a policy, procedure or custom. The Court has made a *de novo* review of these facts and the entire record, and concludes that the Magistrate was correct in her determination. The Court concurs with the Magistrate Judge that Jail Administrator Dannenberg's lack of training in jail policy and procedure and Sheriff Clark's failure to investigate the incident and discipline jail staff were supervisory shortcomings rather than "a policy, custom, or practice of using excessive force against intoxicated, back-talking detainees." *Rec. Dec.* at 27-8.

Moreover, even if the facts could be viewed as a policy or procedure, summary judgment would nonetheless be appropriate because Mr. Eaton has not demonstrated that any of the municipal defendants displayed the requisite deliberate indifference. Beyond his reliance on *Harriman* and Ms. Banks' alleged complaint, Mr. Eaton cannot demonstrate a pattern of similar violations. He may therefore only satisfy the deliberate indifference requirement with a showing that the constitutional violations he alleges were a "plainly obvious consequence" of

Hancock County's failure to train its employees. *See Crete*, 418 F.3d at 66; *Young*, 404 F.3d at 30.

In this respect, the Court agrees with the Magistrate Judge's Recommended Decision, which concludes that the

> [e]vidence is not sufficient to demonstrate deliberate indifference on the part of Hancock County because it does not justify an inferential finding that the use of excessive or punitive force was a "highly predictable consequence" of an obvious shortcoming in training. Stated otherwise, this is not the kind of failure to train case where the training regime is so inherently defective that Eaton can prove his case without adducing evidence of a pattern of similar violations. Eaton has attempted to demonstrate a pattern with his reference to the Harriman case. However, that case does not offer a reliable insight into the treatment of intoxicated prisoners at the Hancock County Jail.

*Rec. Dec.* at 31 (internal citation omitted). Mr. Eaton has not adduced sufficient evidence to satisfy the stringent standard of deliberate indifference. Moreover, Deputy Lepper and Corrections Officers Gunn, Haines, Sullivan, and Weaver all received some form of training on the use of force. Although the level of training may have been limited,[21] there is no record evidence that the training was so lacking as to make excessive or punitive force a highly predictable consequence of the lack of a more extensive training regime. The Court concludes that summary judgment should be granted against the municipal liability claim for Hancock County, the Hancock County Sheriff's Department, Jail Administrator Dannenberg, and Sheriff Clark.

---

[21] Mr. Eaton cites *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1232 (D. Me. 1996), for the proposition that deliberate indifference may be found even where the accused officers received training at the Maine Police Academy. Mr. Eaton's reliance on *Comfort* falls short. In *Comfort*, there was significant evidence demonstrating the municipality's deliberate indifference, including an affidavit from an officer attesting to the police chief's encouragement of aggressive behavior. Here, there was no evidence of an inducement that would lead to foreseeable abuses.

### G. Ronald Eaton's Objection to the Conspiracy Claim

The Magistrate Judge determined that the Court should dismiss Deputy Morang, Officer Hobbs, and Officer Sullivan from Mr. Eaton's civil rights conspiracy claim under 42 U.S.C. § 1983. *Rec. Dec.* at 26. Objecting to the Magistrate Judge's determination, Mr. Eaton argues that all the corrections officers "conspired to deprive [Mr. Eaton] of his right to recover" from his injuries as "they were all present at the jail on the night . . . [and] each had a duty to protect Eaton from harm." *Pl.'s Obj.* at 10. Mr. Eaton's blanket assertion that each one of the corrections officers at the jail that evening was involved in a cover-up is simply not supported by any evidence. Instead, Mr. Eaton cites *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1229 (D. Me. 1996), for the proposition that summary judgment is inappropriate where there are questions "as to a possible agreement between the officers as to [the] use of force in light of the *alleged* falsification of police records." (Emphasis in *Pl.'s Obj.*).

Mr. Eaton's reliance on *Comfort* is misplaced. In *Comfort*, a police officer had testified that officers conspired to falsify police reports. By contrast, here there is no evidence that the officers were in Mr. Eaton's presence at the time of the alleged harm, that these officers had any knowledge of the alleged harm, or that they participated in a conspiracy to conceal the alleged harm. The Court agrees with the Magistrate's assessment that,

> [t]here is no evidence that any of the corrections officers conspired with Deputy Lepper to deprive Eaton of Fourth Amendment rights in connection with his arrest. . . . Nor is there any evidence that Hobbs, Morang, and Sullivan were party to an agreement to punish Eaton

with physical abuse at the jail due to complaints he made about the treatment he received that night and his need for medical attention.

*Rec. Dec.* at 26. The motion for summary judgment against the civil rights conspiracy claim is therefore granted to Officer Morgan, Officer Hobbs, and Sgt. Sullivan because Mr. Eaton relies entirely on unsupported speculation and conclusory allegations to support his claim against these Defendants. *See Sutliffe*, 584 F.3d at 325.

## III.  CONCLUSION

The Court hereby AFFIRMS the Recommended Decision of the Magistrate Judge (Docket # 138). The Court GRANTS the Defendants' Motion for Summary Judgment (Docket # 82) as to Counts III and IV; Count I for Defendants Joshua Gunn, Ryan Haines, and John Weaver. The Court DISMISSES as party Defendants Robert Morang, Crystal Hobbs, Heather Sullivan, Hancock County, the Hancock County Sheriff's Department, Sheriff William Clark, and Jail Administrator Carl Dannenberg. The Court otherwise DENIES Defendants' Motion for Summary Judgment.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 28th day of September, 2010